**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-32307 (DRJ) |
| DIAMOND OFFSHORE DRILLING, INC., *et al.*,[1] | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION OF NICHOLAS GROSSI, MANAGING DIRECTOR AT
ALVAREZ & MARSAL NORTH AMERICA, LLC IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Nicholas Grossi, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M").  I have been a Managing Director at A&M since 2018, and I have been responsible for providing restructuring and reorganization services for companies, their creditors, and other stakeholders across a variety of industries, including offshore drilling services.  My experience involves representing clients in various stages of the restructuring

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Diamond Offshore Drilling, Inc. (1760), Diamond Offshore International Limited (4671), Diamond Offshore Finance Company (0712), Diamond Offshore General Company (0474), Diamond Offshore Company (3301), Diamond Offshore Drilling (UK) Limited (1866), Diamond Offshore Services Company (3352), Diamond Offshore Limited (4648), Diamond Rig Investments Limited (7975), Diamond Offshore Development Company (9626), Diamond Offshore Management Company (0049), Diamond Offshore (Brazil) L.L.C. (9572), Diamond Offshore Holding, L.L.C. (4624), Arethusa Off-Shore Company (5319), Diamond Foreign Asset Company (1496).  The Debtors' primary headquarters and mailing address is 15415 Katy Freeway, Houston, TX 77094.

process for over fourteen years. I received my B.A. in management from Purdue University and an MBA from DePaul University.

2.      I submit this declaration (this "Declaration") in support of the petitions (the "Petitions" and the cases, the "Chapter 11 Cases") for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), filed on April 26, 2020 (the "Petition Date") by the above-captioned debtors and debtors-in-possession (the "Debtors" and together with their non-Debtor affiliates, the "Company"), and the Debtors' related requests for initial relief in the form of motions and applications (the "First Day Motions"), as well as to assist the Court and parties-in-interest in understanding the circumstances that resulted in these Chapter 11 Cases. I understand that the Debtors are also submitting the *Declaration of Marc Edwards, President and Chief Executive Officer of Diamond Offshore Drilling, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Edwards Declaration") contemporaneously herewith.

3.      The Debtors retained A&M to assist with preparing for a potential Chapter 11 filing, and to advise with respect to the Debtors' restructuring and contingency planning, on March 29, 2020.[2] Since A&M's retention, I have supervised and worked closely with the team of A&M professionals that has been helping the Debtors prepare the First Day Motions, complete their cash forecasting and related analyses, compile the diligence necessary to draft the First Day Motions, and otherwise prepare for these Chapter 11 Cases. I have reviewed each of the First Day Motions and any exhibits related

---

[2] A&M was engaged by the Debtors in various other capacities since August 2016.

thereto.  I am familiar  with the contents of the First Day Motions  and the facts set forth therein, all of which I incorporate into my Declaration as if set forth in full herein.

4.       During the course of my engagement by the Debtors, I have become familiar  with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information  supplied  to me by other members of the A&M professionals  engaged on this matter, the Debtors' management and other professionals and advisors, or learned from my review of relevant documents or upon my opinion  based upon my experience and knowledge  of the Debtors' industry, operations, and financial conditions.   If called to testify, I could  and would testify competently  as to the facts set forth herein.  I am authorized  to submit this Declaration.

5.       Each Debtor has assets, property, or other interests located in the United States including:  (a) owning equity interests in United States-incorporated  entities, (b) owning  a bank account with a positive  cash balance at a United States-based financial institution,  (c) maintaining  certain residual interests,  including  retainer amounts paid to United States-based professionals,  (d) being  party to contracts governed by law in the United States, and (e) owning  certain other assets, property,  or interests located in the United States.

## I.       Introduction

6.       To ensure a smooth transition into Chapter 11, limit the operational disruption  of these Chapter 11 Cases, and to facilitate  a successful exit from Chapter 11, the Debtors filed the First Day Motions.  For the reasons described below, the relief sought

in each of the First Day Motions is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest.

7.      The Debtors do not intend for these Chapter 11 Cases to impair their relationships with customers, trade vendors, or employees. As described in the Edwards Declaration, the Debtors' operations and employee base span the globe. As a result, the Debtors' customers, vendors, contract counterparties, and employees, especially those located outside of the United States, likely may not understand the effect of the Chapter 11 process on the Debtors' business. It is important for the Debtors to secure first day relief that will allow them to continue to satisfy their employee and operational obligations in the ordinary course, thereby avoiding unnecessary or misplaced employee and customer attrition.

8.      Moreover, operating in the offshore space means the Debtors conduct business in multiple jurisdictions across the globe and are subject to complicated operational and regulatory requirements of each. Any restriction on the Debtors' ability to operate in the ordinary course could negatively affect the Debtors' business, these Chapter 11 Cases, and the value of the Debtors' estates. The First Day Motions are narrowly tailored to avoid any such disruption.

9.      For these reasons, the relief requested in the First Day Motions is in the best interests of the Debtors, their creditors and all other parties-in-interest. The First Day Motions seek to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a

successful restructuring of the Debtors' operations and balance sheet, (c) best serves the Debtors' estates and creditors' interests, and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.  A description of the relief requested in and the facts supporting each of the First Day Motions follows in <u>Section III</u> below.[3]

## II.      Intercompany Transactions Analysis

10.      In connection with its diligence of the Company and preparation for these Chapter 11 Cases, A&M has been conducting a forensic analysis of the Company's intercompany transactions.  As described further in <u>Section III</u> below, the Company engages in numerous intercompany transactions in the ordinary course of business.  The Debtors therefore asked A&M to analyze with granularity all intercompany transactions down to the sub-ledger level, and as far back as records reasonably permit.  The purpose of A&M's forensic accounting investigation is to fully vet the genesis of the intercompany balances, and to determine, based on an application of appropriate legal standards, the extent to which intercompany transfers constitute allowable claims by and among the various legal entities comprising the Company corporate group.

11.      Illustrative factors A&M will consider as part of its analysis include (a) the existence of documentation supporting the transfers, (b) the economic terms governing the transfers (*e.g.*, interest charged, repayment terms, etc.), (c) the expectation of repayment, and (d) whether balances between corporate entities reflect trade and operational functions.  Applying these standards and other considerations, and in consultation with Paul, Weiss, A&M will assess the enforceability of intercompany

---

[3]      Capitalized terms used but not defined in any section relating to a particular First Day Motion have the meaning ascribed to them in the applicable First Day Motion.

transfers and the extent to which they would be enforceable claims in these Chapter 11 Cases.

12.     The results of A&M's forensic investigation will provide the factual predicate for a sound recovery model that will inform distributable enterprise value scenarios in these Chapter 11 Cases. If I had to testify or the need for expert testimony arises regarding the Company's intercompany transfers in connection with confirmation of a Chapter 11 plan or otherwise, an appropriate witness at A&M would be competent and prepared to provide such expert testimony. A&M's investigation is advanced.

## III.     Relief Sought in the Debtors' Administrative First Day Motions [4]

### A.     Debtors' <u>Emergency</u> Motion for the entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases; and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>")

13.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order (I) directing the joint administration and consolidation of the Chapter 11 Cases for procedural purposes only; and (II) granting related relief. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. The Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.

14.     The Debtors also request a waiver of the requirements imposed by section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n). The use of the proposed simplified caption without full tax identification numbers and previous names will ensure a uniformity of pleading identification. Such information is listed on each

---

[4]     Capitalized terms used herein but not otherwise defined in this section shall have the meanings ascribed to them in the relevant motion.

Debtor's petition which are publicly available. I believe that joint administration and a waiver of the requirements imposed by section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n) will promote the fair and efficient administration of the Chapter 11 Cases.

15.    For these reasons, the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**B.    Debtors' <u>Emergency</u> Motion Seeking Entry of an Order (I) Extending Time to File Schedules of (A) Assets and Liabilities, (B) Current Income and Expenditures, (C) Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports; and (II) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>")**

16.    Pursuant to the Schedules and Statements Extension Motion, the Debtors request entry of an order: (I) extending the deadline by which the Debtors will file (a) their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") to June 9, 2020, without prejudice to the Debtors' ability to request additional extensions for cause, (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Rule 2015.3 of the Federal Rules of Bankruptcy Procedure (the "<u>2015.3 Reports</u>") to and including the later of (i) the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (defined below) (the "<u>341 Meeting</u>") and (ii) June 1, 2020, in each case without prejudice to the Debtors' ability to request additional extensions for cause; and (II) granting related relief.

17.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity. Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, the Debtors may not have access to all of the information required to prepare the Schedules and Statements as of the initial deadline, and in some cases, such information may take 30 days or more to be fully reflected in the Debtors' books and records.

18.     The Debtors have books and records located at various locations throughout the United States, Europe, Asia, and Australia. Information must be gathered from many, if not all, of these locations. Given the size and complexity of the Debtors' business and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors are not able to complete the Schedules and Statements in the fourteen (14) days provided by Bankruptcy Rule 1007(c).

19.     Notably, in the days leading up to the Petition Date, the Debtors' management, key personnel, and professionals have diligently prepared for the filing. The attention of the Debtors' key personnel must remain focused on operational and Chapter 11 compliance issues at the outset of these Chapter 11 Cases, which will facilitate and enable a smooth transition into Chapter 11 and preserve value for the Debtors' estates, creditors, and other parties-in-interest. An extension will not harm creditors or other parties-in-interest because, even under the extended deadline, the Debtors will file the

Schedules and Statements in advance of any deadline for filing proofs of claim in these Chapter 11 Cases.

20.      Cause also exists to extend the deadline for filing the 2015.3 Reports as requested in the Schedules and Statements Extension Motion based on (a) the size, complexity, and geographic scope of the Debtors' business; and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases. Extending the deadline to file the initial 2015.3 Reports will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

21.      For these reasons, the relief requested in the Schedules and Statements Extension Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**C.      Debtors Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) To File a Consolidated List Of the 50 Largest Unsecured Creditors, and (C) to Redact Certain Personal Identification Information; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief (the "Matrix Motion")**

22.      Pursuant to the Matrix Motion, the Debtors seek entry of an order: (I) authorizing the Debtors to (A) file a consolidated creditor matrix in lieu of submitting separate mailing matrices, (B) file a consolidated list of their 50 largest unsecured creditors, and (C) redact certain personal identification information; (II) approving the form and manner of notifying creditors of commencement of the Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code

(if necessary); (III) waiving the requirement to file a list of equity security holders; and (IV) granting related relief.

23.     Although the list of creditors usually is filed on a debtor-by-debtor basis, the Complex Case Procedures allow affiliated debtors in complex Chapter 11 Cases to file a consolidated creditor matrix. Here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome and of little incremental benefit. Further, because a large number of creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 50 largest general unsecured creditors (the "Top 50 List"). The Top 50 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

24.     Cause also exists to authorize the Debtors to redact address information of the Debtors' current and former employees, the Debtors' current and former directors, and the Debtors' individual creditors, to the extent applicable, from the Creditor Matrix because such information could be used to perpetrate identity theft or unlawful injury to an individual, jeopardize essential commercial relationships with the Debtors' customer base, and may result in civil liability or significant financial penalties under applicable data privacy laws governing the use of information outside the United States.

25.     The requirements to file a list of, and to provide notice directly to, equity holders should be modified as to the Debtors in these Chapter 11 Cases. Diamond Offshore Drilling, Inc. ("Diamond Offshore Drilling") is a publicly traded company with approximately 138 million common shares outstanding. Diamond Offshore Drilling does not maintain a list of its equity security holders and, therefore, must obtain the names and addresses of its shareholders from a securities agent. Preparing and submitting such a list with last known addresses for each such equity security holder and sending notices to all such parties will be

expensive and time consuming.  In lieu of filing a list of, and providing notice directly to, equity holders of Diamond Offshore Drilling, the Debtors intend to file an 8-K with the U.S. Securities and Exchange Commission on or about April 27, 2020, which will notify equity holders of Diamond Offshore Drilling regarding the commencement of these cases and provide a link to the website relating to the Chapter 11 Cases set up by the Debtors' claims agent.

26.     Additionally, through Prime Clerk LLC ("Prime Clerk"), the Debtors' proposed claims, noticing, solicitation, and administrative agent, the Debtors propose to serve the Notice of Commencement, on all parties listed on the Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code. Service of the single Notice of Commencement on the Creditor Matrix will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Creditor Matrix.

27.     For these reasons, the relief requested in the Matrix Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest

**IV.     Relief Sought in the Debtors' Operational First Day Motions**

**A.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "Cash Management Motion")**

28.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (I) authorizing use of the Debtors' (A) existing Cash Management System, and authorizing and directing banks and financial institutions to honor and process checks and transfers, (B) authorizing continued use and satisfaction of

Intercompany Transactions, and authorizing the Debtors to use existing Bank Accounts and existing Business Forms; and (II) granting related relief.

29.     As of the Petition Date, the Debtors have approximately $434.9 million of unrestricted cash (the "Unrestricted Cash") which they intend to use to fund their operations in the ordinary course of business and the costs of these Chapter 11 Cases in accordance with the 13-week cash flow forecast attached as **Exhibit A** to the Cash Management Motion (the "Budget"). The Debtors' continued use of their Cash Management System is critical to the uninterrupted operation of their business and their seamless transition to operating as debtors-in-possession in these Chapter 11 Cases. Absent approval of the requested relief, the Debtors will be unable to efficiently fund operations and the administrative costs of these cases, to the detriment of all stakeholders.

30.     **The Cash Management System**.   In the ordinary course of business, the Debtors (collectively, with certain of their non-Debtor affiliates and subsidiaries, the "Company" and each a "Company Entity")[5] operate an integrated cash management system to ensure the efficient operation of their global business (the "Cash Management System"). The Cash Management System consists of approximately 99 bank accounts (the "Bank Accounts") with 21 banks (the "Banks"), located in 22 jurisdictions, and denominated in 19 different currencies.

31.     The Cash Management System allows the Debtors to efficiently collect, transfer, and disburse funds generated through their drilling operations and to conduct accurate cash monitoring, forecasting, and reporting. The Debtors use the Cash Management System to ensure adequate cash availability for each Company Entity and

---

[5]     Each Company Entity that is not a Debtor in these Chapter 11 Cases is referred to as a "Non-Debtor Affiliate".

reduce overall administrative costs by facilitating intercompany transactions among Company Entities. The Debtors' treasury department actively monitors and manages the Cash Management System on a daily basis, subject to well-defined procedures and controls for entering, processing, and releasing funds throughout the system or to third parties.

32. **Cash Pools**. The Cash Management System is organized around two cash pools (the "Cash Pools") that consolidate cash flows and intercompany transactions across the Company and streamline the Debtors' disbursement process. Debtor Diamond Foreign Asset Company ("DFAC") and its subsidiaries participate in a Cash Pool (the "International Cash Pool") maintained at Debtor Diamond Offshore International Limited ("DOIL"), a wholly-owned direct subsidiary of DFAC (the "International Cash Pool Leader"). Debtor Diamond Offshore Drilling, Inc. ("Diamond Offshore") and its subsidiaries that are not participants in the International Cash Pool participate in a cash pool (the "US Cash Pool") maintained at Debtor Diamond Offshore Finance Company, a wholly-owned direct subsidiary of Diamond Offshore (the "US Cash Pool Leader" and, together with the International Cash Pool Leader, the "Cash Pool Leaders"). A schedule listing the Company Entity's that participate in each Cash Pool is attached as **Exhibit C** to the Cash Management Motion.

33. **Cash Management Agreements and Intercompany Notes**. Each Company Entity (other than the Cash Pool Leaders) participates in either the US or International Cash Pool, which participation is generally memorialized through a Cash Management Agreement between the participant and the applicable Cash Pool Leader (collectively, the "Cash Management Agreements"). The Cash Pool Leaders are party to a separate Cash Management Agreement with each other, pursuant to which the US Cash

Pool Leader acts as the Cash Pool Leader and the International Cash Pool Leader is the Cash Pool participant. The majority of the Cash Management Agreements have been in place since 2012, are substantially similar, and are described in more detail in the Cash Management Motion.

34.     In addition, Debtors Diamond Offshore Services Company, as lender, and DOIL, as borrower, are party to an Intercompany Loan Agreement and Promissory Note, dated November 30, 2013 (the "DOSC Intercompany Note"). The DOSC Intercompany Note has a current outstanding balance of approximately $568 million, which is unsecured and has a stated maturity of November 30, 2022. The Debtors established the DOSC Intercompany Note to refinance an existing note that had been in place since 2010, when the original note arose in connection with an internal restructuring of the organization. In the ordinary course of business, the Debtors pay interest on the DOSC Intercompany Note in cash on an annual basis and typically pay down a portion of the outstanding principal amount each year. Continuing payments under the DOSC Intercompany Note postpetition preserves valuable tax attributes for the Debtors' estates while the Intercompany Protocol (as defined below) will ensure these payments do not unduly prejudice or benefit either of the applicable Debtors' estates or their respective creditors.

35.     **Bank Accounts**. The Cash Management System consists of approximately 99 Bank Accounts which generally fall into the following categories: (a) Header Accounts, (b) Concentration Accounts, (c) Collection Accounts, (d) Operating Accounts, (e) Payroll and Benefit Accounts, and (f) Other Accounts.

36.     **Bank Fees**.  The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System in the ordinary course of business (the "Bank Fees").  The Company pays the Banks aggregate Bank Fees of approximately $20,000 per month.  As of the Petition Date, the Debtors estimate that they owe the Banks approximately $30,000 on account of unpaid Bank Fees that will come due and payable after the Petition Date.

37.     **Purchase Card Program**.  As part of the Cash Management System, Debtor Diamond Offshore Drilling, Inc. (the "Purchase Card Borrower") maintains a commercial credit card program (the "Purchase Card Program") with Trust Bank and Wells Fargo Bank.  As further described in the Cash Management Motion, the Purchase Cards issued by Wells Fargo are used primarily for travel expenses incurred by the Debtors' global workforce in the ordinary course of business and are typically issued to the Debtors' employees responsible for planning travel.  The Debtors do not have alternative means readily available to pay these expenses directly and it is not expected that employees would need to cover such business expenses themselves.  The Purchase Cards enable employees to timely incur necessary business expenses and further enable the Debtors to track such expenses in connection with the Cash Management System.

38.     The Purchase Cards issued by Trust Bank are used as a method of payment to approximately 30 vendors.  These vendors require payments from the Debtors to be remitted via credit card.  On a weekly basis, the Debtors fund balances to cards assigned to various vendors scheduled to receive payment for the given week. Subsequent to the Debtors' funding of such balances, the applicable vendors are able to draw down on

their card balance and thereby receive payment for the goods and services provided to the Debtors.

39.     **Prepetition Modifications to the Cash Management System**.  The Debtors made certain modifications to the Cash Management System in the weeks leading up to the Petition Date as part of their prudent cash management practices and in response to various requests or requirements from certain Banks and other third-parties (collectively, the "Prepetition Modifications").    The Debtors seek authority to utilize the Cash Management System as modified by the Prepetition Modifications postpetition.    Each Prepetition Modification is described below.

40.     **Header Accounts**.  Many of the Debtors' Banks, including the Banks where the Debtors maintain their Concentration Accounts, are also lenders under the Debtors' Revolving Credit Facility (an "RCF Lender").  Historically, these accounts held substantially all of the Debtors' cash, either directly or through certain Investment Accounts linked to these accounts.  Shortly before the Petition Date, the Debtors determined to transfer the cash held in these accounts to Bank Accounts at Banks that are not RCF Lenders.

41.     Accordingly, before the Petition Date the Debtors opened three Header Accounts at Signature Bank (one for the International Cash Pool Leader and two for the US Cash Pool Leader) and two Header Accounts at Citizens Bank, both of which are U.S. Trustee authorized depositories and not an RCF Lender, and transferred substantially all of the Unrestricted Cash held by each Cash Pool Leader to one or more of their Header Accounts.

42.     Postpetition, the Debtors' will keep substantially all of the Unrestricted Cash on deposit in the Header Accounts and transfer cash between the applicable Header Accounts and Concentration Accounts of each Cash Pool Leader on an as-needed basis. Because the applicable Cash Pool Leader owns both the applicable Header Accounts and Concentration Accounts, these transfers do not affect any intercompany balances among the Company Entities.

43.     **Administrative Expense Account**. Prior to the Petition Date, the Debtors designated one of the Header Accounts at Signature Bank as a dedicated and segregated account to fund certain administrative expenses during these Chapter 11 Cases, primarily professionals' fees (the "Administrative Expense Account"). The Debtors seek authority to operate the Administrative Expense Account pursuant to the procedures described in the Cash Management Motion (the "Administrative Expense Procedures"), which will ensure that the Debtors' maintain sufficient Unrestricted Cash to fund these Chapter 11 Cases for the benefit of all stakeholders.

44.     The Administrative Expense Procedures are intended to perform a similar function as a customary "carve out" in a cash collateral or debtor-in-possession financing order. Approval of the Administrative Expense Procedures is in the best interests of the Debtors' estates and all parties- in-interest, and ensure that the Debtors maintain sufficient cash on account to fund the amounts necessary to appropriately administer these Chapter 11 Cases.

45.     **JPM Cash Collateral Account**. In 2015, Debtor Diamond Offshore entered into a Continuing Agreement for Standby Letters of Credit with JPMorgan Chase Bank, N.A ("JPM") (the "JPM L/C Agreement"). Prior to the Petition

Date, Diamond Offshore had approximately $2.5 million of unsecured letters of credit outstanding under that agreement related to certain performance and other bonds related to the Debtors' rigs.

46.     Shortly before the Petition Date, JPM required that the Debtors cash collateralize the letters of credit outstanding under the JPM L/C Agreement as a condition to maintaining the letters of credit. Accordingly, Diamond Offshore entered into a Cash Collateral Agreement with JPM, dated April 18, 2020, pursuant to which Diamond Offshore agreed to deposit cash collateral into a money market deposit account at JPM to secure the outstanding obligations to JPM under the JPM L/C Agreement (the "JPM Cash Collateral Account"). As of the Petition Date, Diamond Offshore maintained approximately $2.6 million on deposit in the Cash Collateral Account.

47.     **Pre-Funding of Certain Checks, ACH, and other Transfers**. Shortly before the Petition Date, the Banks that operate certain of the Bank Accounts used to make cash disbursements required the Debtors to start pre-funding any scheduled disbursements from those accounts. Prior to instituting this requirement, the Debtors could schedule disbursements from such accounts regardless of the funds in the applicable Bank Account, with the amounts necessary to cover such disbursements being swept from the applicable Concentration Account on an as-needed basis. Postpetition, the Debtors must ensure the applicable Bank Account has sufficient cash deposits to cover the amount of any requested disbursements at the time a disbursement request is made. In addition, the Debtors are no longer able to utilize certain Bank Accounts that historically operated as zero balance accounts.

48.      **Ordinary Course Cash Flows**.  In the ordinary course of business, substantially all of the Company's revenue is generated through its global drilling operations (the "Drilling Contract Revenue").  As detailed in the Cash Management Motion, the drilling Contract Revenue is received into one or more Collection Accounts of certain Debtors and Non-Debtor Affiliates that are party to drilling contracts (each, an "Operating Entity").  The vast majority of these amounts are then transferred through the Cash Management System to the Concentration Accounts held by the applicable Operating Entity's Cash Pool Leader. Historically, the Debtors would leave these amounts on deposit in Concentration Accounts or invest the excess Unrestricted Cash in Investment Accounts linked to the applicable Concentration Account. Postpetition, the Debtors will sweep excess Unrestricted Cash to the applicable Cash Pool Leader's Header Account and will transfer the funds back to the appropriate Concentration Accounts on an as-needed basis.

49.      The remaining balance of the Drilling Contract Revenue is received into specialized Concentration Accounts held by Operating Entities denominated in the local currency of the jurisdictions where the Operating Entity operates (each a "Local Disbursement Account").  These amounts are typically related to third-party reimbursements and other amounts received under an applicable drilling contract in the local currency of the jurisdiction where a rig is operating.  The applicable Operating Entity then uses those amounts to satisfy local operating expenses and make other disbursements to fund operations in the ordinary course.

50.      In addition to the cash received into the Local Disbursement Accounts, the Debtors fund operations through separate operating groups responsible for

administering operations in a given region (each, an "Operating Group"). The US Gulf of Mexico Operating Group's operating costs are funded directly by the US Cash Pool Leader, which disbursements are tracked and allocated back to the appropriate Company Entity on an intercompany basis through the Cash Pool Protocol. The Debtors fund the remaining Operating Groups and Cost Centers based on cash expense reports (the "Cash Reports") submitted to the Debtors' treasury department by each Operating Group and Cost Center every seven days.

51.     **The Debtors' Intercompany Transactions**. The Debtors engage in a variety of intercompany transactions (the "Intercompany Transactions") in the ordinary course of business that are monitored and recorded on the Debtors' books and records. Substantially all Intercompany Transactions are effectuated and recorded through the Cash Pools and the Cash Management Agreements pursuant to an established protocol (the "Cash Pool Protocol").

52.     Under the Cash Pool Protocol, each participant in a Cash Pool maintains an aggregate intercompany balance against the applicable Cash Pool Leader but not against any other Company Entity (subject to certain *de minimis* exceptions). In addition, the Cash Pool Leaders maintain an aggregate intercompany balance between themselves subject to their Cash Management Agreement that is adjusted to account for Intercompany Transactions either directly between the Cash Pool Leaders or between Company Entities that participate in different Cash Pools. As detailed in the Cash Management Motion, as Intercompany Transactions occur in the ordinary course, and are properly recorded and tracked.

53. **Support Services Transactions**. The Company engages in several intercompany transactions related to certain general, corporate, and administrative services that ensure the efficient operation of their global business (the "Support Services"). These services are shared on both a centralized and local basis, depending on the nature of the Support Services and the needs of the Debtors' business.

54. Substantially all of these services are performed through the Company's primary headquarters in Houston, Texas.[6] The Company records costs associated with Centralized Support Services to include the costs of the applicable services together with (a) the payroll costs of the Debtors' employees that perform these services, and (b) any related overhead costs incurred by or allocated to the departments in which these employees work (collectively, the "Centralized Support Services Costs"). The Centralized Support Services Costs are incurred by Debtor Diamond Offshore Management Company—which employs substantially all of the Debtors' U.S. employees—and totaled approximately $26.1 million for the quarter ended March 31, 2020.

55. In addition to the Centralized Support Services Costs, certain of the Company's Operating Groups and cost centers utilize decentralized Support Services (the "Local Support Services") in support of ordinary course operations in a particular region. The Local Support Services allow the Company to efficiently and safely meet local business requirements outside of the United States and, accordingly, are generally not duplicative of the Centralized Support Services. Certain Company Entities utilize the

---

[6]   Historically, the Company also received certain administrative and technical support services through Loews Corporation pursuant to a services agreement. Such services, and the related services agreement, were terminated prior to the Petition Date.

Local Support Services in support of the Company's drilling operations. The Debtors allocate the Local Support Services among the appropriate Operating Entities and Rig Owners through the Month End Close Process and record the Intercompany Transactions through the Cash Pool Protocol.

56.     **Ordinary Course Operating Expenses**.  Certain Company Entities, while important to the Debtors' overall business, do not generate sufficient cash flow from operations to fund operating expenses in the ordinary course. Accordingly, the applicable Cash Pool Leader typically funds these Company Entities and obligations on an as-needed basis to ensure that the Debtors' drilling operations remain uninterrupted. These Intercompany Transactions may involve cash transfers or book entries and are recorded on the Debtors' books and records through the Cash Pool Protocol.

57.     **Bareboat Charters**.  In the ordinary course of business, it is common that the Operating Entity that operates the Debtors' rigs under a particular drilling contract is not the Rig Owner of the applicable Rig.  In such scenarios, the Rig Owner enters into a bareboat charter with the Operating Entity (each, a "Bareboat Charter") that obligates the Operating Entity to pay charter hire to the Rig Owner at an agreed upon rate. The Debtors currently have nine Bareboat Charters in place in connection with their existing drilling contracts.  Charter hire under the Bareboat Charters is typically settled each quarter and recorded on the Debtors' books and records through the Cash Pool Protocol.[7]

---

[7]     As described below, charter hire under Bareboat Charters between Rig Owners and Operating Entities in separate Cash Pools is also aggregated at the Cash Pool Leader-level and settled between the Cash Pool Leaders in cash on a quarterly basis subject to certain adjustments.

58.     **Offshore Employees**.  Certain of the Company's employees that work on the Debtors' rigs are not employed by the Operating Entity that operates the rig on which the employee works (the "Offshore Employees").  The Company Entity that employs and pays a particular Offshore Employee charges the applicable Operating Entity for the Offshore Employee's services, and those costs are allocated as book entries through the Cash Pooling Protocol.

59.     **Centralized Insurance Programs**.   The Debtors maintain a centralized insurance program that allows the Debtors to reduce their aggregate insurance costs through lower overall premiums.[8]   Specifically, Debtor DODI maintains global insurance policies on behalf of itself and certain of its subsidiaries as named insureds (the "Insured Subsidiaries").   The insurance premiums are then allocated to the Insured Subsidiaries depending on the type of insurance and rig-owning status of the applicable Insured Subsidiary.   Certain insurance premiums are allocated exclusively across rig-owning entities based on level of activity.   Other insurance premiums are allocated across both rig-owning and non-rig-owning entities.   Finally, certain other insurance premiums are allocated exclusively to Debtor Diamond Offshore Management Company, a non-rig owning entity.   These allocations are recorded on the Company's books and records in accordance with the Cash Pool Protocol.

60.     In addition, the Debtors are required to post surety bonds or stand-by letters of credit to support operations in the ordinary course of business.  Debtor Diamond

---

[8]     The Debtors insurance programs are described at length in the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Prepetition Insurance and Surety Bond Programs, (B) Pay All Obligations with Respect Thereto, and (C) Renew, Supplement, and Enter into New Insurance Policies; and (II) Granting Related Relief*, filed contemporaneously herewith in the Chapter 11 Cases.

Offshore Company typically provides the funds for both the surety bonds and stand-by letters of credit. Debtor Diamond Offshore International Limited also funds certain select stand-by letters of credit. If Diamond Offshore Company posts collateral for the benefit of an affiliate, the Intercompany Transaction is recorded through the Cash Pool Protocol.

61.     **Intercompany Protocols**. The Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business to preserve the value of their respective estates for the benefit of all stakeholders. As described in the Cash Management Motion, through the Cash Pool Protocol, the Debtors maintain accurate records of all Intercompany Transactions, including cash transfers, and can ascertain, trace, and account for all Intercompany Transactions. Accordingly, the Debtors believe that continuation of the Intercompany Transactions, including Intercompany Transactions with Non-Debtor Affiliates, is in the best interests of the Debtors' estates.

62.     In addition, the Debtors seek authority to implement certain protocols (the "Intercompany Protocols") with respect to postpetition Intercompany Transactions that are settled in cash among Company Entities (each an "Intercompany Cash Transaction") to ensure that no Debtor or its creditors are unduly harmed or unjustly benefit from these transactions while allowing the Debtors to continue funding operations in the ordinary course of business. As detailed in the Cash Management Motion, Intercompany Cash Transactions are tracked and recorded in the Debtors' books and records through the Cash Pool Protocol and effectuated through the Cash Management System.

63.     The Debtors seek authority to implement the Intercompany Protocol with respect to the Intercompany Cash Transactions as an equitable and efficient

mechanism to allow the Debtors to continue operating their business and Cash Management System in the ordinary course while preserving the intercompany "status quo" as of the Petition Date to the greatest extent possible under the circumstances.

64.     The Intercompany Protocol will ensure the Debtors can continue to postpetition Intercompany Cash Transactions in the ordinary course of business without unduly prejudicing any individual Debtor's estate or creditors.   In addition, all Intercompany Transactions are an essential component of the Debtors' global operations and they are critical to ensure the safe, uninterrupted operation of their rigs.  Due to the sophistication of the Debtors' treasury department, the Cash Pool Protocol, and the Intercompany Protocol, the Debtors will be able to closely monitor and record all Intercompany Transactions while protecting the interests of their respective estates and creditors.  Any interference or disruption with the Intercompany Transactions would cause material disruption to the Debtors' business to the detriment of the Debtors' stakeholders.

65.     I believe that the relief requested in the Cash Management Motion is essential to the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' business.   For these reasons, the relief requested in the Cash Management Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**B.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion")**

66.     Pursuant to the Taxes Motion, the Debtors seek entry of an order (I) authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees (as each is defined herein); and (II) granting related relief.

67.     In the ordinary course of business, the Debtors collect and incur taxes and fees in approximately 30 jurisdictions worldwide related to sales and use, property, income, customs and inspections, operations, third-party services, and employees, including value added tax and similar foreign jurisdiction transaction-based taxes (all such taxes, collectively, the "Taxes and Fees"). The Debtors pay or remit, as applicable, Taxes and Fees weekly, monthly, bi-monthly, quarterly, semi-annually, annually, or on other terms to the federal government and various state and local governments and applicable authorities, depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations. From time to time, the Debtors also receive tax credits for overpayments or refunds in respect of Taxes or Fees. The Debtors use these credits in the ordinary course of business to offset against future Taxes or Fees, or have such amounts refunded to the Debtors. The Debtors estimate that approximately $15,800,000 in Taxes and Fees relating to the prepetition period have accrued and may become due and owing (or arise in connection with a collateral or bond posting obligation) in the ordinary course.

68.     The Debtors' ability to pay the Taxes and Fees is critical to maintaining their continued and uninterrupted operations. I believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations. Specifically, unless the Debtors are permitted to pay the Taxes and Fees in the ordinary course of business, the Debtors risk Authorities attempting to suspend the Debtors' operations, file liens, seek to lift the automatic stay, impose liability on the Debtors' officers and directors, or pursue other remedies that could cause material harm to the Debtors' estates. Moreover, to the extent that the Debtors are not able to timely pay the prepetition Taxes and Fees,

they may ultimately be required to pay those amounts with additional interest and penalties. The Debtors' failure to pay the prepetition Taxes and Fees as they come due thus may ultimately increase the amount of priority claims held by the Authorities against the Debtors' estates to the detriment of the Debtors' general unsecured creditors and other stakeholders.

69.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their business in Chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**C.     Debtors' Emergency Motion for the Entry of Interim and Final Orders (I) Authorizing the Payment of Claims of Critical Vendors, Shippers, Warehousemen, and Certain Other Specified Trade Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "Vendor Motion")**

70.     Pursuant to the Vendor Motion, the Debtors seek entry of orders (I) authorizing, but not directing, the payment of claims of critical vendors, shippers, warehousemen, and certain other specified trade claimants; (II) confirming administrative expense priority of outstanding orders; and (III) granting related relief as the Court deems just and proper.

71.     **Overview**. The Debtors provide contract drilling services to the energy industry around the globe with a fleet of 15 offshore drilling rigs, consisting of four drillships and 11 semisubmersible rigs. In the course of providing these offshore drilling services, the Debtors operate and maintain highly complex drilling units that conduct precise underwater operations in remote locations. These operations are subject to significant hazards inherent in offshore drilling. In addition, the Debtors' operations are

27

heavily regulated and subject to numerous international, foreign, U.S., state, and local laws and regulations, including regulations controlling the discharge of materials into the environment and occupational safety and health standards.

72.     The Debtors require specialized equipment, materials, chemicals, and services to safely operate their fleet in accordance with these applicable laws and regulations. The Debtors procure the requisite parts, equipment, supplies, and services to maintain their fleet from a variety of vendors. As discussed further below, the Debtors' vendors and suppliers are integral to the Debtors' ability to operate.

73.     The Debtors' vendors and suppliers are located around the world. Even minor disruptions in the supply chain could have adverse consequences for the Debtors, their employees, customers, and the environment. Certain of the Debtors' vendors are critical to maintaining a physical workplace that minimizes the potential for COVID-19 incidents, which would have a material adverse impact of the value of the Debtors' estates.

74.     **Critical Vendors**. In the ordinary course of business, the Debtors incur certain obligations (the "Critical Vendor Claims") to suppliers of goods and services used primarily on drilling rigs (the "Critical Vendors") owned and operated by the Debtors. The Critical Vendor Claims include amounts to purchase certain supplies that are utilized on board the Debtors' rigs, and also includes services provided to maintain the operation of the rigs. The Debtors require the goods and services provided by the Critical Vendors to maintain the safety of their fleet and protect the environment. As detailed in the Vendor Motion, Critical Vendors include: (a) original equipment manufacturers, (b) Well Control Equipment providers and servicers, (c) fuel and lubricant suppliers, (d) mooring

and anchoring services providers, (e) providers of tools, complex hardware, components, and systems, (f) communications providers, and (g) workforce deployment providers.

75.     The disruption of any of the Critical Vendors' delivery of necessary goods and services may prevent safe and efficient operation of the Debtors' fleet and halt drilling.   Even a temporary disruption of the Debtors' operations would lead to adverse consequences, including the loss of revenue from current or future contracts, and may impede the Debtors' ability to retain current contracts and bid on and secure new customer contracts. I believe this is true even in certain situations where a Critical Vendor is party to a contract with the Debtors, particularly in connection with Well Control Equipment providers.   There is no room for error in maintaining safe operations on the Debtors' fleet, and the Debtors cannot risk the safety of their crew pending dispute resolution.

76.     Due to the specialized and remote nature of the Debtors' operations, some of the Critical Vendors are the sole source of their goods and services or are among a small number of such suppliers in the world or in those geographic regions in which the Debtors operate.  These Critical Vendors may refrain from supplying goods and services essential for the day-to-day operations of the Debtors if they are not paid.  Moreover, certain Critical Vendors are reliant upon the Debtors for the continued operation of their own business; without the Debtors' payments, several Critical Vendors would have little or no working capital, and may be forced to cease operations.  Accordingly, it is imperative that the Debtors maintain positive relationships with the suppliers of the goods and services essential to their operations throughout the course of these Chapter 11 Cases. It is therefore crucial that the Debtors be allowed to pay Critical Vendors in the ordinary course so as to avoid the potential disruption to their operations.

77.     **Statutory Lien Vendors**.  As detailed in the Vendor Motion, in the ordinary course of business, the Debtors engage a variety of shippers, warehousemen, and other trade parties who may have statutory lien rights including:  (a) logistics service providers, freight forwarders, rig movers and towers ("Shippers"),  (b) shipyards ("Warehousemen"), (c) offshore logistics providers ("Offshore Logistics Providers"), and (d) specialized mechanical maintenance engineering providers ("Other Lien Claimants" and together with Shippers, Warehousemen, Offshore Logistics Providers, the "Statutory Lien Vendors").

78.     I have been advised that under most state laws, as well as maritime law, the Statutory Lien Vendors may have a lien on the goods in their possession or under their control, which lien secures the charges or expenses incurred in connection with the transportation, storage, or provision of such goods.  I further understand that, with respect to maritime liens, as a general matter of maritime law, almost anything that "touches the rig" has the right to a potential lien on the rig or the good or product delivered to or used for the rig.  As a result, I believe that certain Statutory Vendors may refuse to deliver or release the Debtors' inventory or other goods and materials, as applicable, before their liens and claims have been satisfied.

79.    **HSE Suppliers**.  In the ordinary course of business, the Debtors incur obligations to suppliers (the "HSE Suppliers") of goods and services utilized in the Debtors' operations, payment of which are necessary to ensure the health, safety, environmental, and regulatory compliance and integrity of the Debtors' operations but which are not Critical Vendor Claims, statutory lien claims, or 503(b)(9) Claims (the "HSE Claims").

80.    The Debtors rely on certain vendors that provide services which either directly result in the rigs and drillships operating in a safe and compliant manner, or supplies such as maritime/navigation documents, personal protective equipment, workwear, and tools which allow the crews to execute their duties safely.  These vendors also provide a variety of inspection services, in some cases required to operate the drilling rigs, or personnel screening, and training programs designed to onboard the workforce, provide instruction for safe operations or prevent injury for both onshore and offshore personnel, rig and equipment inspection and certification, and classification services.

81.    **Foreign Vendors and Utilities**.  The Debtors rely on vendors and service providers that are not U.S.-based, and who are not familiar with U.S. bankruptcy law or principles.  In addition, in many non-U.S. ports around the world, the Debtors rely on non-U.S. utility providers for essential utility services such as electricity.  Many of these foreign vendors and utilities (the "Foreign Vendors and Utilities") do not speak English as their native language and may not be comfortable with, understand, or feel themselves bound by, orders of a U.S. bankruptcy court.

82.     I believe that a material risk exists that the Foreign Vendors and Utilities holding claims against the Debtors (the "Foreign Vendor and Utility Claims") may disregard the automatic stay, and engage in conduct that disrupts the Debtors' operations, or may simply be confused by the Chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures. Notably, Foreign Vendors and Utilities that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods, services, and utilities.

83.     Foreign Vendors and Utilities may also sue the Debtors in a foreign court to recover prepetition amounts owed to them. If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors and Utilities may seek to exercise post-judgment remedies, including seeking to withhold vital supplies and services from the Debtors. Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation or, most importantly, the ability to replace these Foreign Vendors and Utilities (absent payment of amounts sought), their business could be irreparably harmed by any such action to the detriment of the Debtors' estates and creditors.

84.     Given the importance the Foreign Vendors and Utilities play in the Debtors' global operations, even a temporary disruption in the Debtors' supply chain would have a negative effect on the operation of the Debtors' business. Indeed, the vast majority of Foreign Vendors and Utilities also satisfy the criteria for consideration as a Critical Vendor set forth above. Accordingly, the Debtors need the ability to pay the Foreign Vendor and Utility Claims on an uninterrupted basis.

85.     **503(b)(9) Claimants**.  In the ordinary course of their business, the Debtors received certain goods or materials from various vendors (the "503(b)(9) Claimants") within 20 days before the Petition Date.  The 503(b)(9) Claimants may not be Critical Vendors, Statutory Lien Vendors, HSE Suppliers or Foreign Vendors and Utilities. However, the Debtors believe that their claims are entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Moreover, most of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Debtors obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claim, especially claims that would be entitled to administrative expense claim treatment.  The Debtors also believe that certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery, with a negative impact on the Debtors' liquidity.

86.     **Payment of Outstanding Purchase Orders**.  In the ordinary course of business, the Debtors may have ordered goods prior to the Petition Date that will not be delivered until after the Petition Date (the "Outstanding Purchase Orders").  To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Purchase Orders unless the Debtors issue substitute purchase orders postpetition.  Receiving delivery of Outstanding Purchase Orders may be critical to preventing any disruption to the Debtors' business operations, and the Debtors request the authority, but not the direction to, pay Outstanding Purchase Orders as they come due that, in the Debtors' sole discretion, are critical to their operations.

87.     **Identification and Payment of Specified Trade Claimants**. A&M worked closely with the Debtors to identify the Specified Trade Claimants that are subject to the Vendor Motion.  Along with management, we considered numerous factors when identifying whether a particular vendor was a Critical Vendor, Statutory Lien Vendor, HSE Supplier, Foreign Vendor or Utility, or 503(b)(9) Claimant (collectively, the "Specified Trade Claimants" and their respectively claims, the "Specified Trade Claims").

88.     These include: (a) whether the vendor is the "sole source" provider of necessary equipment or among a handful of such providers in the world or in the particular geographic regions in which the Debtors operate, (b) whether a vendor contract exists that could be deemed executory allowing the Debtors to compel performance in the absence of satisfying a prepetition claim, (c) whether the failure to pay prepetition claims could result in the vendors, both foreign and domestic, refusing to provide essential goods or services in the future, thereby forcing the Debtors to cease operations or lose time and money, and (d) whether certain specifications, customization, location, or other relevant characteristics of the drilling units or ongoing projects prevent the Debtors from obtaining goods or services from alternative sources without significant burden or expense.  Based on this process, I believe that each of the Specified trade Claimants appropriately qualifies for the relief requested in the Vendor Motion.

89.     I believe that the relief requested in the Vendor Motion is essential to the Debtors' business and for these reasons, the relief requested in the Cash Management Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**D.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries,**

**Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion")**

90.     Pursuant to the Wages Motion, the Debtors seek entry of a final order (I) authorizing, but not directing, the Debtors to (A) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (B) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (II) granting related relief.

91.     **Overview of Employees and Contractors**. As of the Petition Date, the Debtors and their non-Debtor affiliates employ approximately 2,300 workers in 10 countries across the globe, of which 1,617 workers are employees of the Debtors (the "Employees"), and 683 workers are employees of non-Debtors (the "Non-Debtor Employees" and together with the Employees, the "Company Employees"). The majority of the Employees provide services directly related to the Debtor's drilling operations, while others perform managerial and administrative functions critical to the administration of these Chapter 11 Cases and the Debtors' restructuring.

92.     The Debtors also supplement their workforce from time to time by relying on specialized and experienced contractors (collectively, the "Contractors"). The Contractors are a critical and cost-effective supplement to the efforts of the Debtors' work force, and typically provide engineering and IT services or highly-skilled labor on the drilling rigs. Generally, the Contractors are paid directly by the Debtors.

93.     The Employees and Contractors are critical to the safe and efficient operation of the Debtors' rigs. These individuals provide highly-skilled labor, specialized services, and other expertise that would be difficult if not impossible to replace on any reasonable timeline. It is critical to the Debtors' ability to maximize value for stakeholders

35

that they preserve this valuable workforce and obtain authority to continue compensating these individuals in the ordinary course of business.

94.     In the majority of cases, the Employees and Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families.   These individuals often travel far from home to perform vital services in a challenging and dangerous environment. The Employees and Contractors will be exposed to significant financial hardships if the Debtors are not permitted to pay wages and salaries, provide employee benefits, and maintain Employee benefit programs in the ordinary course of business.

95.     The Debtors seek to minimize the personal financial burden Employees and Contractors would suffer if prepetition Employee and Contractor-related obligations are not paid or remitted when due or as expected. The Debtors seek authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to Employee compensation and benefits. These include, among other things, wages, salaries, contractor fees, withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions and other retirement savings contributions), payroll processing, reimbursable expenses, director fees, certain noninsider incentive and recognition programs, health insurance benefits, health savings accounts, health reimbursement accounts, life and AD&D insurance, short- and long-term disability benefits, the workers' compensation program, business travel insurance, retirement savings plans, benefit administration services, time-off benefits (including vacation time, unpaid vacation time, excused work days, holidays and parental leave), non-insider severance

programs, COBRA benefits, and other benefits the Debtors historically have provided to Employees and/or Contractors.

96.     In addition, the Debtors seek authority to continue honoring Employee compensation and benefits provided to Employees on a postpetition basis in the ordinary course of business and pay all necessary costs incident to these arrangements. The Employee compensation and benefits are described in greater detail, including the amounts that will come due in the interim period and after entry of a final order, in the Wages Motion and are summarized below.

97.     **Compensation and Compensation-Related Obligations**.  In the ordinary course of business, the Debtors pay Employee Wages, PTO Benefits, Third Party Staffing Obligations, Employee Withholding Obligations, Employer Withholding Obligations, and Employer Payroll Taxes.

98.     **Employee Health Benefits and Entitlements**.  The Debtors provide Medical Benefits, Dental Plans, Vision Plans, and HSA/FSA Accounts to Employees and incur Benefit Administrator Obligations related thereto.

99.     **Employee Insurance Programs**.  The Debtors provide DLD&A Employee Insurance Programs, Workers' Compensation Programs and Jones Act Coverage for their Employees.

100.     **Employee Retirement Programs**.  The Debtors provide several retirement and savings programs to their eligible Employees. These include traditional and ROTH 401(k) retirement savings plans (the "401(k) Plan"), a similar active retirement savings plan in the U.K. for U.K.-based Employees (the "U.K. DC Plan" and together with the 401(k) Plan, the "DC Plans").

101.    **Other Employee Benefits and Obligations**.  The Debtors have certain additional employee related benefit programs and related obligations.  These include customary benefits such as (a) Reimbursable Expenses, (b) Expatriate Expenses, (c) Non-Employee Director Compensation, and (d) Employee Lifestyle Benefits.  Employee Lifestyle Benefits include student tuition assistance, healthy lifestyle consulting, travel insurance and an employee assistance program.

102.    **Reduction in Force Initiative**.  On April 15, 2020, the Debtors executed a reduction in force throughout their global operations in the United States and Brazil.  Additionally, consultation procedures concerning potential headcount reductions were initiated in Australia and the United Kingdom.  In the United States and Brazil approximately 126 employees were terminated, with the largest number being formerly employed in the U.S.  Following the consultation procedure in Australia, another seven employees were terminated.  Headcount reductions globally across the above-mentioned locations, in addition to Romania and Singapore, total 135 employees.  The U.K. consultation procedure is ongoing and will complete by May 15, 2020 at which time it is possible additional headcount reductions will occur within the U.K. and additional severance obligations may arise.

103.    In conjunction with these actions, the Company expects to pay up to $7.1 million in severance to affected employees, most of which was paid prepetition.  Severance amounts paid to date average approximately $45,000 per individual.  In certain cases, the receipt of the severance was conditional upon signing a release.  Additionally, 61 Contractors had their services discontinued, but were owed no severance.  As noted above, the U.K. consultation procedure remains on-going.  The Company has prefunded

potential U.K. severance obligations of approximately $550,000 to a non-Debtor affiliate, who will, subject to and following the consultation process, make such payments, if any, that come due. In the event any severance obligations come due, the Debtors will be liable for associated Employer Payroll Taxes in the approximate amount of £200,000. As of the Petition Date, other than with respect to potential U.K. Employer Payroll Taxes, no accrued and unpaid amounts are owed in connection with the reduction in force initiative.

104.     I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and that absent the payment of the Employee compensation and benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these Chapter 11 Cases. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts—which may not even be possible given the overhang of these Chapter 11 Cases.

105.     I therefore believe that payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood to retain the Employees as the Debtors seek to operate their business in these Chapter 11 Cases. For these reasons, the relief requested in the Wages Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

E.   **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Supplement, Purchase, or Enter Into New Insurance Policies; and (II) Granting Related Relief (the "Insurance Motion")**

106.   Pursuant to the Insurance Motion, the Debtors seek entry of an order (I) authorizing the Debtors to (A) continue prepetition insurance and surety bond programs, and pay obligations related thereto, and (B) renew, supplement and enter into new insurance coverage or surety bonds in the ordinary course of business on a postpetition basis; and (II) granting related relief.

107.   **The Insurance Programs**.   The Debtors maintain a variety of insurance programs (each, an "Insurance Program") in the ordinary course of business to provide appropriate coverage for, among other things, the Debtors' rigs and drilling equipment, directors and officers, marine liability, third-party liability, personal injury, auto liability, commercial property, pollution liability, operator extra expense, war risk insurance, kidnapping and ransom, crime coverage, employers' liability coverage, and fiduciary liability coverage.   In addition to the Global Policies, subsidiary operating companies, which include Debtors and non-Debtor affiliates, may be required to purchase additional coverage in the jurisdictions in which they operate.

108.   **Deductibles**.   Pursuant to the Insurance Policies, the Debtors may be required to pay various deductible or retention amounts (collectively, "Deductibles") depending on the type of claim and insurance policy involved.   For example, the Debtors carry marine liability insurance covering certain legal liabilities, including coverage for certain personal injury claims, and generally covering liabilities arising out of or relating to pollution and/or environmental risk.

109.     Under these policies, the Debtors' deductibles for marine liability coverage related to insurable events arising from named windstorms in the U.S. Gulf of Mexico are $25.0 million for the first occurrence and vary in amounts ranging between $25.0 million and, if aggregate claims exceed certain thresholds, up to $100.0 million for each subsequent occurrence, depending on the nature, severity and frequency of claims that might arise during the policy year. The Debtors' deductibles for other marine liability coverage, including personal injury claims not related to named windstorms in the U.S. Gulf of Mexico, are $5.0 million for the first occurrence and vary in amounts ranging between $5.0 million and, if aggregate claims exceed certain thresholds, up to $100.0 million for each subsequent occurrence, depending on the nature, severity and frequency of claims that might arise during the policy year. The Debtors are self-insured for physical damage to rigs and equipment caused by named windstorms in the U.S. Gulf of Mexico.

110.     The Debtors believe that the policy limit for their marine liability insurance and their Insurance Policies generally are within the range that is customary for companies of the Debtors' size in the offshore drilling industry and is appropriate for the Debtors' business.

111.     **Surety Bonds and Related Relief**.  In the ordinary course of business, the Debtors are required, pursuant to federal, state, and local law, to provide surety or other performance bonds (collectively, the "Surety Bonds," and their usage, the "Surety Bond Program"). The Surety Bond Program generally covers obligations owed to federal, state, local, and foreign governmental units and other public agencies. The

obligations secured by the Surety Bond Program relate to, among other things: (a) litigations, (b) taxes, and (c) customs fees.

112. **Zurich Surety Agreement**. Diamond Offshore is party to a General Indemnity Agreement (the "Indemnity Agreement"), dated as of October 23, 2018, with Zurich American Insurance Company, Zurich Insurance group and their respective subsidiaries, affiliates and associated companies (collectively, "Zurich") pursuant to which Diamond Offshore indemnifies Zurich for any surety bonds or other guarantees Zurich issues for Diamond Offshore or any of its subsidiaries (collectively, the "Zurich Surety Bonds") in connection with covered claims. As of the Petition Date, approximately $18.2 million in Zurich Surety Bonds are outstanding for which Diamond Offshore has liability under the Indemnity Agreement (collectively, the "Zurich Indemnity Obligations"), $15.4 million of which are posted in connection with the Brazilian Tax Dispute described below.

113. An ongoing tax dispute in Brazil (the "Brazilian Tax Dispute") implicates the Indemnity Agreement and the Zurich Surety Bonds. At issue is the deductibility of certain importation and expatriate costs allegedly owed to Brazil by a non-Debtor affiliate, Brasdril Soc. de Perfuracoes Ltda ("Brasdril"). The Debtors submit that satisfying the Zurich Indemnity Obligations postpetition is in the best interests of the Debtors' estates because the Zurich Surety Bonds are necessary to maintain the Brazilian Tax Dispute, which, if successful, will avoid up to $90 million of Brasdril's potential tax liability. It is also essential that Brasdril remain in good standing with the Brazilian authorities given its status as a contract counterparty with Petrobras.

114.    The Brazilian taxing authorities assert that Brasdril owes approximately $90 million in unpaid income taxes, an amount which Brasdril is actively contesting through the appropriate channels in Brazil.  To fully prosecute Brasdril's rights under Brazilian law, Brasdril, as a contesting party, is required to post a surety bond for any disputed tax amount that proceeds to the judicial stage of the adjudication process. Zurich posted the Zurich Surety Bonds, for which Diamond Offshore has corresponding indemnity obligations, to permit continued adjudication of Brasdril's disputed tax liability. I understand that under the Indemnity Agreement, Diamond Offshore must provide Zurich with collateral in the amount that Zurich determines suffices to fund any liability or loss that may occur under the applicable insurance policy.

115.    Initially, Zurich required Diamond Offshore to provide collateral equal to 50% of the outstanding amount of the Zurich Surety Bonds, or approximately $10 million.  To satisfy its indemnity obligation, Diamond Offshore obtained a $6 million letter of credit under its Revolving Credit Facility in January 2020 and was scheduled to provide an additional letter of credit for the remaining $4 million on or before May 1, 2020.

116.    In the weeks leading up to the Petition Date, however, Zurich requested that Diamond Offshore collateralize the full outstanding amount of the Zurich Surety Bonds, or an additional $10 million.[9]  Given the timing, Diamond Offshore did not believe it was practicable to have additional letters of credit issued under the Revolving Credit Facility, or to obtain other letters of credit from third-party providers.  Instead, the

---

[9]    As noted above, the outstanding Zurich Surety Bonds total $18.2 million, for which Zurich is asking the Debtors to post $20.9 million in collateral.  The difference between the amount of the posted bonds and the requested collateral is attributable to foreign exchange rate effects.

Debtors and Zurich agreed that Diamond Offshore could provide Zurich with cash collateral of $14.9 million to maintain the Zurich Surety Bonds until the Debtors obtain a letter of credit from a third-party provider. If the Debtors obtain an acceptable letter of credit postpetition, Zurich will return the cash collateral to the Debtors upon its receipt.

117.    As of the Petition Date, approximately $20 million of the $90 million in disputed tax liability has moved from the administrative to the judicial adjudicative stage, and the balance is expected to progress to the judicial stage sometime during the pendency of the Chapter 11 Cases. Accordingly, the Debtors seek the authority but not the direction to (a) satisfy their obligations under the Indemnity Agreement in the ordinary course, (b) obtain any necessary letters of credit from third-party providers in the ordinary course in support of the Zurich Indemnity Obligations, in each case in the Debtors' sole discretion, and (c) in the Debtors' sole discretion, obtain an acceptable letter of credit to replace some or all of the cash collateral posted under the Indemnity Agreement.

118.    Continuation and renewal of the Insurance Programs and honoring the Insurance Obligations, as well as entry into new Insurance Policies, is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, in many cases, the coverage provided by the Insurance Policies is required by the regulations, laws, credit documents, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code and the requirements of the Office of the United States Trustee for the Southern District of Texas as provided in the *Operating Guidelines and Reporting Requirements for Debtors-in-Possession and Trustees*. Accordingly, the Debtors request authority to maintain the existing Insurance Policies, pay any prepetition

obligations (if any) related thereto, and to renew, supplement, or enter into new Insurance Policies in the ordinary course of business on a postpetition basis.

119.    For these reasons, the relief requested in the Insurance Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**F.    Debtors' Emergency Motion for the Entry of an Order Enforcing the Protections of Sections 105(A), 362, 365, 525 and 541 of the Bankruptcy Code and Granting Related Relief (the "Stay Motion")**

120.    Pursuant to the Stay Motion, the Debtors seek entry of an order enforcing the Bankruptcy Code's automatic stay and other injunctive relief provisions (the "Bankruptcy Protections") and granting them such other and further relief as the Court deems just and proper.

121.    The Company is a leader in offshore drilling, providing contract drilling services to the energy industry around the globe with a total fleet of 15 offshore drilling rigs. As of the Petition Date, the Company has aggregate contract backlog totaling approximately $1.4 billion, and deploys a fleet of offshore drilling rigs consisting of 11 semisubmersibles and four ultra-deepwater drillships around the world.

122.    The Debtors filed these Chapter 11 Cases to preserve their valuable contract backlog, stabilize operations, and to effect a value-maximizing restructuring to overcome the challenges currently facing the energy industry in which the Debtors operate. Critical to the success of this objective is the immediate and effective enforcement of the Bankruptcy Protections worldwide against all stakeholders, particularly those located outside the U.S.

123.    The Company operates in a highly competitive and cyclical industry that has experienced a sustained period of declining day rates and overall demand for contract drilling services. The general industry downturn began in 2014 but has worsened

in recent months due to two unprecedented developments: an oil "price war" between OPEC and Russia and the COVID-19 pandemic. Between January 1, 2020 and April 21, 2020, Brent Crude prices fell by over two-thirds. On April 20, 2020, U.S. West Texas Intermediate crude oil prices traded with negative prices for the first time in history. The COVID-19 pandemic has further affected oil markets and created significant operational challenges, including international and domestic travel restrictions, social distancing requirements, business restrictions, local "stay at home" orders, and other logistical hurdles. These developments significantly impacted global economies and placed substantial strain on the Company's operations and the global offshore drilling industry.

124.    These developments have also impacted the Company's customers and almost all have requested some form of concessions from the Company under their existing contracts. One customer has recently sought to formally terminate its agreement with the Company.[10] Accordingly, the Debtors need clear and direct evidence of the Bankruptcy Protections that they can use to preserve their customer contracts, particularly with respect to those foreign counter-parties that may believe themselves outside the scope of its effect.

125.    The Debtors seek the relief in the Stay Motion out of an abundance of caution and to assist them in better informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Stay

---

[10]  The Company does not believe that the contract counterparty has a valid or lawful right to terminate the drilling contract or that the purported notice of termination that the Company received on April 20, 2020 is effective. The Debtors remain in discussions to resolve this dispute consensually and commercially. In addition, the Debtor party to the contract filed, contemporaneously with the Chapter 11 filing, an adversary complaint seeking a determination that the purported termination is invalid and that the drilling contract remains in effect.

Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help guard the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties-in-interest.

126.    For these reasons, the relief requested in the Stay Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**G.    Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock of Diamond Offshore Drilling, Inc. and Claims Against Debtors (the "NOL Motion")**

127.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (a) approving the Procedures to protect the potential value of the Debtors' Tax Attributes for use in connection with the reorganization of the Debtors, (b) directing that any purchase, sale, other transfer of Common Stock or Options or declaration of worthlessness with respect to Common Stock in violation of the Procedures and any purchase, sale, or other transfer of Claims in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief

128.    The Debtors believe that, as of the Petition Date, they had federal NOL carryovers in the amount of approximately $885 million and disallowed business interest carryforwards of approximately $232 million.  These NOLs and certain other Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these Chapter 11 Cases. The Tax Attributes may be of significant value to the Debtors and their estates because the Debtors can generally carry forward their Tax Attributes to offset their future taxable income, thereby reducing their future aggregate tax obligations.  In addition, such Tax Attributes may generally be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11

Cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

129.    To maximize the use of the Tax Attributes and potentially enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to establish Procedures to closely monitor certain transfers of Common Stock and/or Options and claims of worthless stock deductions so as to be in a position to act expeditiously to prevent such transfers or claims of worthless stock deductions, if necessary, with the purpose of preserving the Tax Attributes.  By establishing and implementing such Procedures, the Debtors will be in a position to object to transfers of Common Stock and/or Options and declarations of worthlessness with respect to Common Stock that could result in an Ownership Change occurring before the effective date of a Chapter 11 plan or any applicable bankruptcy court order that would threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

130.    Aside from preserving the value of the Tax Attributes during the pendency of these cases, it also may be important for the Debtors to take steps to preserve the value of such Tax Attributes upon the effectiveness of a Chapter 11 plan.  It is possible that pursuant to a Chapter 11 plan the special relief afforded by section 382($l$)(5) of the IRC could be both available and beneficial to the Debtors; the Debtors, in that circumstance and subject to further factual development and analysis, may seek to qualify for such relief. Such relief, however, may become unavailable to the Debtors if the trading and accumulation of certain Claims prior to the effective date of a Chapter 11 plan is left unrestricted.

131.    I believe that the relief requested in the NOL Motion is essential to the Debtors' business and will help preserve valuable tax attributes for the benefit of the Debtors' estates and stakeholders. For these reasons, the relief requested in the NOL Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**H.    Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Companies, (II) Prohibiting Utility Provider From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion")**

132.    Pursuant to the Utilities Motion, the Debtors seek entry of an order, (a) approving the proposed adequate assurance of payment for future utility companies; (b) prohibiting utility companies from altering, refusing, or discontinuing utility services; (c) establishing procedures for determining adequate assurance of payment; and (d) granting related relief.

133.    **Utility Services and Utility Companies**.  In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telephone, internet, cable, and other similar services (collectively, the "Utility Services") from several utility companies either directly or through applicable brokerage or management agreements (collectively, the "Utility Companies").

134.    Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. The Debtors' business operations require them to maintain constant contact and communication with their offshore rigs and vessels, which requires, among other things, uninterrupted

electricity and telecommunications services. If any Utility Company refuses or discontinues service, even for a brief period, it could potentially disrupt and jeopardize the safety of the Debtors' business operations. Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

135. **Proposed Adequate Assurance of Payment**. The Debtors intend to pay all undisputed postpetition charges owed to the Utility Companies in the ordinary course. Moreover, the Debtors expect their available cash will be more than sufficient to pay for the Debtors' postpetition use. To provide the Utility Services with adequate assurance of payment pursuant to section 366 of the Bankruptcy Code, the Debtors propose to deposit $48,454.57 (the "Adequate Assurance Deposit") into a segregated bank account (the "Adequate Assurance Account") within 20 days of entry of an Order. The Adequate Assurance Deposit is equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average third-party utility expenses over the 12-month period ended March 31, 2020. I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' cash flow from operations and cash on hand, demonstrates their ability to pay for future Utility Services in accordance with prepetition practice (collectively, the "Adequate Assurance") and constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code. The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.

136. For these reasons, the relief requested in the Utilities Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

I.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Honor and Incur Obligations Under Customer Contract and Customer Programs, and (III) Granting Related Relief (the "<u>Customer Programs Motion</u>")**

137.   Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) honor and incur obligations under customer programs, and (ii) obtain new customer programs and (b) granting related relief.

138.   The Debtors have a substantial and valuable contract backlog. Their operating revenues therefore depend on maximizing the deployment of their rigs through drilling contracts and other customer agreements (the "<u>Customer Contracts</u>"). Maintaining the Existing Customer Contracts, including by executing related extension options, along with the ability to attract, seek, enter into, and secure new Customer Contracts ("<u>New Customer Contracts</u>") at competitive day rates is critical to the Debtors' success and viability. In the ordinary course of business, the Debtors incur obligations under Customer Contracts and in connection with bidding for and entering into New Customer Contracts, as described below (such obligations, collectively the "<u>Customer Programs</u>").

139.   Each Customer Contract governs the terms under which the Customers receive drilling services from a Debtor. In exchange, the Customers pay the Debtors daily revenue known as the "day rate." "Day rate" payments may fluctuate based on several factors, including the actual performance of the Debtors' rigs, and may be amended from time to time in conjunction with other contractual amendments such as term extensions (the "<u>Payment Adjustments</u>").

140.   The Debtors also procure equipment or services in connection with the operation of the rigs (the "<u>Operating Costs</u>") to discharge their obligations under their Customer Contracts. The Operating Costs are a necessary component of ordinary rig

operations and critical for the continued performance of the Customer Contracts. There are instances whereby a Customer Contract requires a specific vendor to be used and/or requires the vendor to perform certain services. In connection with the Operating Costs, as well as with other expenses under Customer Contracts, including agreed-upon capital improvements, there are costs associated with deploying the drilling rigs to Customer-specified well sites, as well as other Customer-specific agreements that require significant capital outlay (collectively, the "Customer-Specific Expenses"). Some of the Customer Contracts require the Customer to prepay the Debtors for some or all of the Customer-Specific Expenses (the "Customer Prepayments"). Accordingly, in the ordinary course of the Debtors' business, the Debtors may occasionally be obligated to perform a variety of services for Customers for which they have already received payment from Customers.

141.     From time to time, in the ordinary course of business, the Debtors must provide certain Customers with security or credit enhancement to support their Customer Contracts, including bank guarantees and indemnification obligations (collectively, the "Security Obligations"). The Debtors also occasionally provide bid bonds, letters of credit, or other collateral in the ordinary course of business ("Bid Collateral") as part of the bidding process for New Customer Contracts. Other Customer Contracts permit the Customer to seek additional performance security, such as letters of credit or cash deposits ("Additional Assurance").

142.     Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders. For these reasons, the relief requested

in the Customer Programs Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**J.      Debtors' Emergency Application for (I) Appointment of Prime Clerk as Noticing and Balloting Agent, and (II) Granting Related Relief (the "Noticing and Balloting Agent Application")**

143.    Pursuant to the Noticing and Balloting Agent Application, the Debtors seek entry of an order appointing Prime Clerk as Claims and Noticing Agent in the Debtors' Chapter 11 Cases.  Specifically, the Debtors request entry of an order appointing Prime Clerk as the Debtors' Claims and Noticing Agent to, among other tasks, (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties-in-interest, (b) provide computerized claims, objection, solicitation, and balloting database services, and (c) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the engagement agreement, dated April 9, 2020 (the "Engagement Agreement").

144.    The Debtors' selection of Prime Clerk to act as the Noticing and Balloting Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

145.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these Chapter 11 Cases. In light of the number of parties-in-interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a noticing and balloting agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing as

well as soliciting and balloting votes. Accordingly, this is in the best interests of both the Debtors' estates and their creditors.

146.     For these reasons, the relief requested in the Noticing and Balloting Agent Application is appropriate under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

April 26, 2020

/s/ Nicholas Grossi
Nicholas Grossi
Alvarez & Marsal North America, LLC
Managing Director