**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| DIAMOND OFFSHORE DRILLING, INC., *et al.*,[1] | Case No. 20-32307 (DRJ) |
| | (Joint Administration Requested) |
| Debtors. | |

**DECLARATION OF MARC EDWARDS, PRESIDENT AND CHIEF
EXECUTIVE OFFICER OF DIAMOND OFFSHORE DRILLING, INC., IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Marc Edwards, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the President and Chief Executive Officer of Diamond Offshore Drilling, Inc. ("Diamond Offshore"). Diamond Offshore is a publicly-traded company organized under the laws of Delaware and a debtor and debtor-in-possession in the above-captioned cases of Diamond Offshore and 14 of its direct and indirect subsidiaries (collectively, the "Debtors," and together with Diamond Offshore's indirect non-Debtor subsidiaries and affiliates, the "Company"). A list of the Debtors and their non-Debtor affiliates is attached as Exhibit A.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Diamond Offshore Drilling, Inc. (1760), Diamond Offshore International Limited (4671), Diamond Offshore Finance Company (0712), Diamond Offshore General Company (0474), Diamond Offshore Company (3301), Diamond Offshore Drilling (UK) Limited (1866), Diamond Offshore Services Company (3352), Diamond Offshore Limited (4648), Diamond Rig Investments Limited (7975), Diamond Offshore Development Company (9626), Diamond Offshore Management Company (0049), Diamond Offshore (Brazil) L.L.C. (9572), Diamond Offshore Holding, L.L.C. (4624), Arethusa Off-Shore Company (5319), Diamond Foreign Asset Company (1496). The Debtors' primary headquarters and mailing address is 15415 Katy Freeway, Houston, TX 77094.

2.      I joined Diamond Offshore in 2014 as President and Chief Executive Officer. Prior to joining Diamond Offshore, I spent almost my entire career at Halliburton Company ("Halliburton"), one of the world's largest and most diversified oilfield services companies. I started at Halliburton as a field engineer in Kuwait in 1984, after which I worked around the globe with progressively greater management responsibilities. Before joining Diamond Offshore, I was a member of Halliburton's Executive Committee, where I most recently served as Senior Vice President, responsible for the Completion and Production Division, which at the time was the largest of Halliburton's two divisions.

3.      I submit this declaration (this "Declaration") in support of the Debtors' petitions (the "Petitions" and the cases, the "Chapter 11 Cases") for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), filed on April 26, 2020 (the "Petition Date"), and the Debtors' related requests for initial relief in the form of motions and applications (the "First Day Motions"), as well as to assist the Court and parties in interest in understanding the circumstances that resulted in these Chapter 11 Cases. I understand that the Debtors are also submitting the *Declaration of Nicholas Grossi, Managing Director at Alvarez & Marsal North America, LLC in Support of Chapter 11 Petitions and First Day Motions* (the "Grossi Declaration") contemporaneously herewith.

4.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Company's management and other professionals and advisors, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors'

industry, operations, and financial conditions.   If called to testify, I could and would testify competently as to the facts set forth herein.  I am authorized to submit this Declaration.

## I.   <u>Introduction</u>

5.      The Company is a leader in offshore drilling, providing contract drilling services to the energy industry around the globe with a total fleet of 15 offshore drilling rigs.  The Company traces its beginnings to the earliest days of the offshore drilling industry.  Decades of innovation, multiple acquisitions of rigs and companies, and an unwavering commitment to safety have defined Diamond Offshore's history and established it as a world leader in offshore drilling.   As of the Petition Date, the Company has aggregate contract backlog totaling approximately $1.4 billion, and deploys a fleet of offshore drilling rigs consisting of 11 semisubmersibles and four ultra-deepwater drillships around the world.

6.      The Company operates in a highly competitive and cyclical industry that has experienced a sustained period of declining dayrates and overall demand for contract drilling services. The general industry downturn began in 2014 but has worsened in recent months due to two unprecedented developments:   an oil "price war" between OPEC and Russia and the COVID-19 pandemic.  Between January 1, 2020 and the Petition Date, Brent Crude prices fell by over two-thirds. On April 20, 2020, U.S. West Texas Intermediate crude oil prices traded with negative prices for the first time in history.  The COVID-19 pandemic has further affected oil markets and created significant operational challenges, including international and domestic travel restrictions, social distancing requirements, business restrictions, local "stay at home" orders, and other logistical hurdles. These developments significantly impacted global economies and placed substantial strain on the Company's operations and the global offshore drilling industry.

7.     These developments have also impacted the Company's customers and almost all have requested some form of concessions from the Company under their existing contracts. One customer—Beach Energy—has recently sought to formally terminate its agreement with the Company.[2]  As of the Petition Date, and subject to ongoing dialogue with Beach Energy, the Company has effectively managed these demands to preserve the contract backlog and customer relationships by, among other things: (a) entering into contract amendments with certain customers, (b) negotiating standby arrangements to cover the Company's costs while rigs are subject to travel restrictions or other COVID-19 related limitations, and (c) managing through multiple operational and logistical challenges to ensure the continued operation of the Company's rigs, including mandatory quarantines, temperature checks, and testing at heliport and on rig, and other policies implemented in response to COVID-19.

8.     In addition to working to preserve its customer relationships and contract backlog, the Company has taken measures to preserve its liquidity in the current environment. Among other things, on March 17, 2020, the Company borrowed approximately $400 million under the Revolving Credit Facility as a precautionary measure to increase its cash position and preserve financial flexibility in light of uncertain market conditions. Following the March 17 draw, the Company borrowed an additional $36 million under the Revolving Credit Facility. Subsequently, in order to preserve cash and avoid providing a priority to one subset of unsecured creditors, on April 15, 2020, the board of directors of Diamond Offshore (the "Board") determined to withhold the $14 million interest payment due under the Company's 2039 Senior Notes (defined

---

[2]     As discussed below, the Company disputes the validity of Beach Energy's ("Beach") purported termination. In addition, the Debtor party to the Beach contract has filed, contemporaneously with the chapter filing, an adversary complaint against Beach seeking a determination that Beach's purported termination is invalid and that the drilling contract remains in effect.

below).  As a result, the Company entered into the 30-day grace period under the 2039 Senior Notes Indenture (defined below).

9.      Given the need to preserve liquidity and protect contract backlog, and guided by an overriding goal of maximizing value for the benefit of all stakeholders, the Debtors, in consultation with their advisors, elected to commence these Chapter 11 Cases to stabilize their operations, conserve and manage liquidity, and effect a restructuring while proactively managing the combined effects of the COVID-19 pandemic and distressed energy markets on their business.

## II.      Diamond Offshore's Operations

10.      The Company's headquarters are in Houston, Texas.  Its primary regional offices are located in Brazil, the United Kingdom and Australia, with local offices in other countries as required to support operations.  As of the Petition Date, approximately 2,300 people work for the Company onboard its rigs and in its offices.

### A.      Markets

11.      The Company's principal markets for its offshore contract drilling services are: (a) the Gulf of Mexico, including the U.S. and Mexico; (b) South America, principally offshore Brazil, as well as Trinidad and Tobago; (c) Australia and Southeast Asia, including Malaysia, Myanmar, and Vietnam; (d) Europe, principally offshore the U.K; (e) East and West Africa; and (f) the Mediterranean.

12.      The Company actively markets its rigs worldwide.  From time to time, the Company's fleet operates in various other markets through the world in addition to its principal markets.

## B.    Fleet Overview

13.    With its fleet of 15 offshore drilling floater rigs, Diamond Offshore provides global contract drilling services to the energy industry.  Modern offshore drilling rigs are substantial structures that can accommodate crews of over 200 employees.  Because of their sheer size and the complexity of the technology necessary to construct and operate modern offshore drilling rigs, they are long-lived assets and are costly to purchase, own, maintain, and operate.

14.    During 2019, the Company invested significant capital into the differentiation of its ultra-deepwater drillships and enhancement of its moored asset capabilities.  During the year, seven of the Company's 13 actively marketed rigs were in shipyards for upgrades or survey work. During early 2019, the Company completed the reactivation of the *Ocean Endeavor*, which is currently on contract in the U.K. The Company also completed the reactivation and upgrade of the *Ocean Onyx* in late 2019.  As part of the upgrade of the *Ocean Onyx*, the Company increased the rig's variable deck load capability, reduced rig motion response and made other technologically desirable enhancements. With its proactive fleet investments now largely complete, the Company expects capex to decline by approximately 40% in 2020 as compared to 2019.  The Company is well-positioned to benefit from the important investments it made in 2019.  Based on average rig scores using applicable industry metrics, the Debtors' moored fleet rates well above that of its peers.[3]

15.    The Company's fleet consists of two types of floater rigs:  drillships and semisubmersible rigs.  A floater rig is a type of mobile offshore drilling rig that floats and does not rest on the seafloor.   As of the Petition Date, the Company had four drillships and eleven

---

[3]    JP Morgan and Diamond Offshore data, March 2019.

semisubmersible rigs.[4]  The following table summarizes the status of the Company's fleet as of the Petition Date:

| Rig | Type | Status | Customer | Location |
|---|---|---|---|---|
| *Ocean BlackHawk* | Drillship | Standby | Occidental (formerly Anadarko) | U.S. Gulf of Mexico |
| *Ocean Patriot* | Semisub | Working | Apache Beryl I Limited | U.K. |
| *Ocean BlackLion* | Drillship | Yard | BP Exploration & Production, Inc. | U.S. Gulf of Mexico |
| *Ocean BlackHornet* | Drillship | Working | BP Exploration & Production, Inc. | U.S. Gulf of Mexico |
| *Ocean BlackRhino* | Drillship | Working | Hess Corporation | U.S. Gulf of Mexico |
| *Ocean Onyx*[5] | Semisub | Awaiting customer instruction | Beach Energy (Operations) Limited (formerly Lattice Energy Limited) | Australia |
| *Ocean Valor* | Semisub | Working | Petroleo Brasileiro S.A.-Petrobras | Brazil |
| *Ocean Courage* | Semisub | Working | Petroleo Brasileiro S.A.-Petrobras | Brazil |
| *Ocean Endeavor* | Semisub | Working | Shell U.K. Limited | U.K. |
| *Ocean Valiant*[6] | Semisub | Working | Shell U.K. Limited | U.K. |
| *Ocean Apex* | Semisub | Working | Woodside Energy Limited | Australia |
| *Ocean Monarch* | Semisub | Standby | Posco Daewoo Corporation | Malaysia |
| *Ocean America* | Semisub | Cold stacked | N/A | Malaysia |
| *Ocean Rover* | Semisub | Cold stacked | N/A | Malaysia |

---

[4]     Three of the semisubmersible rigs are either cold or warm stacked. "Warm-stacked" is a term used to describe a rig that is idled (not contracted) and maintained in a "ready" state with a full or near-full crew to enable the rig to be quickly placed into service when contracted. "Cold-stacked" is a term used to describe an idled rig for which steps have been taken to preserve the rig and reduce certain costs, such as crew costs and maintenance expenses. Depending on the amount of time that a rig is cold-stacked, significant expenditures may be required to return the rig to a "ready" state.

[5]     As discussed below, the Debtors' drilling contract with Beach Energy is subject to a contract dispute.

[6]     The *Ocean Valiant* is expected to complete its current contract in early May 2020.

| Rig | Type | Status | Customer | Location |
|---|---|---|---|---|
| *Ocean Great White* | Semisub | Warm Stacked | N/A | U.K. |

### A.    Drillships

16.    A drillship is a drilling rig with a ship-like design equipped with a drilling derrick and other drilling equipment typically near the middle of the ship. Drillships are usually self-propelled, mobile vessels and are positioned over a drillsite using a dynamic positioning ("DP") system. Each of the Company's four drillships are designed to drill in water up to 12,000 feet deep. The *Ocean Black Hawk*, depicted below, is typical of the Company's drillships:



### B.    Semisubmersibles

17.    A semisubmersible rig consists of an upper working and living deck resting on vertical columns connected to pontoons. Semisubmersible rigs operate in a "semi-submerged" position, remaining afloat, off bottom, in a position in which the lower hull is approximately 55 to 90 feet below the waterline and the upper deck protrudes well above the surface. Semisubmersible rigs hold position while drilling by use of a series of small propulsion units or thrusters that provide DP, to keep the rig on location, and/or with anchors tethered to the sea bed. Diamond Offshore's

semisubmersibles are designed to drill in water ranging from 3,000 to 10,000 feet deep. The *Ocean Endeavor*, depicted below, is typical of the Company's semisubmersible rigs:



### C. <u>Innovation and Differentiation</u>

18.     Delivering leading performance and operational uptime remains one of the most critical elements of success in the Company's industry. In the Debtors' industry, uptime is both a driver of revenue and a measure of operational efficiency. An important way to mitigate utilization risk is through the avoidance of unplanned blowout preventer ("<u>BOP</u>") stack pulls. BOP stack pulls remain one of the largest contributor to non-productive time ("<u>NPT</u>") for deepwater rigs and result in a material loss of revenue for the drilling contractor and increased cost to the oil and gas operator. Accordingly, the Company continuously looks for ways to improve BOP reliability and lower the "Total Cost of Ownership" for the customer.

19.     Innovation and the development of new technologies and business models are critical ways to accomplish this goal. In 2016, the Company revolutionized the offshore drilling industry through its unique Pressure Control by the Hour® ("<u>PCbtH</u>") service model. Prior to PCbtH, an offshore drilling company would typically purchase its BOPs from the BOP original equipment manufacturer ("<u>OEM</u>"), and then pay the OEM to repair the BOP when it was

malfunctioning. BOPs are necessary for drilling operations, and drilling companies are typically not paid by their customers for time incurred in pulling a BOP to the surface and repairing the BOP, so a single BOP repair can easily result in millions of dollars of lost revenue for a drilling company. Under the Company's innovative PCbtH model, BOP ownership and maintenance reverts to the OEM, and the Company only pays the OEM for the use of a functioning BOP, thereby financially motivating the OEM to keep the BOP in good repair and functioning. The PCbtH approach has delivered dramatic results since its launch, enabling the Company to significantly reduce downtime on all of its drillships.

20.     In the third quarter of 2019, the Company introduced its Stack-View™ service, a first-of-its-kind service that applies 24/7 real-time monitoring, data visualization, and advanced analytics to identify trends and detect anomalies in BOP performance. The Stack-View technology enables the Company to optimize its BOP maintenance program, mitigating BOP stack pulls and reducing their already industry-leading NPT by approximately 50%. The Company successfully deployed its Stack-View service on six of its rigs in 2019 and expects to deploy this technology across the remainder of the fleet in 2020.

21.     Throughout 2019, the Company also continued to roll out its Sim-Stack® service across the fleet. Introduced in 2018, the Company's Sim-Stack service creates a virtual replica "digital twin" of a BOP system that simulates the BOP's performance in order to identify potential modifications that improve the unit's reliability and redundancy. In its first 18 months of operation, the Sim-Stack technology led to the prevention of 10 unplanned BOP pulls, yielding an estimated $35 million in revenue preservation through the avoidance of unplanned downtime. By effectively implementing and utilizing these new technologies, the Company experienced only one unplanned "in-operation" BOP pull during 2019. The superior performance delivered by these

technologies and innovations is a primary reason the Company's drilling rigs have proven to be so desirable in what continues to be an oversupplied market and has enabled the Company to be the only offshore drilling company with backlog for all of its drillships.

22.     Another key differentiator for the Company is its unique position as the only major offshore driller that continued to allocate significant capital to the underserved moored floater market – a key area of operational focus and differentiation for the Company. Towards that end, the Debtors upgraded the *Ocean Apex*, *Ocean Endeavor*, and *Ocean Onyx*. Unlike the drillship market where rig oversupply continues to dampen the recovery in dayrates, rates were improving in the moored floater market prior to the current market disruption caused by COVID-19. The Company believes that with these actions, they have the most desirable moored asset fleet in the market.

### D.     Customer Contracts

23.     The Company provides offshore drilling services to a customer base that includes major and independent oil and gas companies, and government-owned oil companies. As of April 1, 2020, the Company's contract backlog was $1.4 billion in the aggregate, attributable to nine customers. Backlog is a function of utilization and dayrates and is generally expected to increase in a recovering market.

24.     During 2019, the Company performed services for 12 different customers. Its most significant customers during 2019 were: (a) Hess Corporation, which accounted for roughly 30% of the Company's annual revenue; (b) Occidental (formerly Anadarko), which accounted for roughly 21% of the Company's annual revenue; and (c) Petróleo Brasileiro S.A. (Petrobras, the Brazilian national oil company), which accounted for roughly 20% of the Company's annual revenue. The Company performs services for several of other customers, including BP and Shell.

25.     The Company typically obtains its drilling contracts through a competitive bid process but it is not unusual for the Company to be awarded drilling contracts following direct negotiations. The Company's typical drilling contracts generally provide for a basic dayrate (*i.e.*, a flat daily fee) regardless of whether or not drilling results in a productive well. Typically, drilling contracts also provide for reductions in rates during periods when the rig is being moved or when drilling operations are interrupted or restricted by equipment breakdowns, adverse weather conditions, or other circumstances. Accordingly, the Company's ability to efficiently operate its fleet with maximum utilization rates and without lost-time incidents is critical to its long-term success.

26.     Under its dayrate drilling contracts, the Company generally pays the operating expenses of the rig, including wages and the cost of incidental supplies. Historically, dayrate drilling contracts have accounted for the majority of the Company's revenues. Additionally, on occasion, the Company's dayrate drilling contracts may also provide for the ability to earn performance-based incentive bonuses from customers. The duration of a dayrate drilling contract is generally tied to the time required to drill a single well or a group of wells, in what is referred to as a well-to-well contract, or a fixed period of time, in what is referred to as a term contract.

### E.     Competition

27.     The Company competes on a worldwide basis, but competition may vary significantly by region at any particular time. Competition for offshore rigs generally takes place on a global basis, as these rigs are highly mobile and may be moved from one region to another, although at a cost that may be substantial. It is characteristic of the offshore drilling industry to move rigs from areas of low utilization and dayrates to areas of greater activity and relatively higher dayrates. The current oversupply of offshore drilling rigs also intensifies price competition.

28.     Based on industry data, there are approximately 760 mobile drilling rigs (drillships, semisubmersibles, and jack-up rigs)[7] in service worldwide, including approximately 240 floater rigs. Despite recent consolidation in the industry, the offshore drilling industry remains highly competitive with numerous industry participants, none of which has a dominant market share at this time. As noted, drilling contracts are typically awarded on a competitive bid basis. Typically, price is the primary factor in determining which qualified contractor is awarded a contract. However, customers may also consider rig availability and location, a drilling contractor's operational and safety performance record, and condition and suitability of equipment.

29.     In the Debtors' business, maintaining high standards of safety is both a moral and economic imperative. Safety incidents on rigs can involve shutting down operations, personal injury, loss of life, environmental damage, destruction of property, loss of revenue, negative publicity, and litigation. Shutting down a rig can cost the Debtors hundreds of thousands of dollars a day or lead to termination by a customer for lack of performance. The Debtors believe that their commitment to safety is a key competitive differentiator and critical in order to continue winning customer contracts and maintaining the Debtors' high quality backlog.

**F.     Efficiency Initiatives and Reduction in Force**

30.     In addition to developing new technologies, the Company has continuously striven to improve efficiency and processes. In 2019, it launched Engenity, a Lean/Six Sigma-based methodology and structured continuous improvement process in which all Diamond Offshore employees are engaged to help eliminate waste and variation in the Company's current processes across the organization and to improve its problem-solving skills without sacrificing safety or

---

[7]     Diamond Offshore does not have any jack-up rigs in its fleet.

quality. These efforts have yielded an estimated $9 million of realized benefits from the use of Engenity methods and tools.

31.    As a direct result of the impacts of current market conditions and commodity pricing, and in an effort to preserve value, on April 15, 2020, the Company executed a reduction in force throughout its shore-based operations in the U.S. and Brazil. Additionally, consultation procedures concerning potential headcount reductions were initiated in Australia and the U.K. In the U.S. and Brazil, approximately 126 employees were terminated, with the largest number being formerly employed in the U.S. Following the consultation procedure in Australia, another seven employees were terminated. Headcount reductions globally across the above-mentioned locations, in addition to Romania and Singapore, total 135 employees. As of the Petition Date, the U.K. consultation procedure is ongoing and will be completed by May 15, 2020, at which time it is possible that additional headcount reductions may occur in the U.K.

32.    In conjunction with these actions, the Company expects to pay up to $7.1 million in severance to affected employees, most of which was paid prepetition. Severance amounts paid to date average approximately $45,000 per individual. In certain cases, receipt of the severance was conditional upon signing a release of potential claims. Additionally, 61 contractors had their services discontinued, for which no severance was owed.

### G.    Corporate History

33.    The origins of Diamond Offshore date back to 1953, when Alden J. Laborde founded Ocean Drilling and Exploration Co. ("ODECO") in New Orleans, Louisiana. In the early 1960s, Don McMahon took over a fledgling onshore drilling company in Texas, renaming it Diamond M Drilling Co. ("DMDC"). In 1970, McMahon took DMDC public and expanded into the offshore drilling business, purchasing jack-up, barge, and semisubmersible rigs. Later that

decade, Western Oceanic attempted a hostile takeover of DMDC but DMDC was saved by a "white knight", Kaneb Services, Inc. ("Kaneb"). In the 1980s, Loews Corporation, a diversified conglomerate headquartered in New York ("Loews") purchased substantially all of DMDC's assets. In 1982, DMDC, under Loews' ownership, purchased all of ODECO's outstanding stock. In 1993, DMDC was renamed Diamond Offshore.

34. Until October 1995, Diamond Offshore remained a wholly-owned subsidiary of Loews. That year, Loews sold 30% of the company in an initial public offering, and Diamond Offshore began trading on the New York Stock Exchange under the ticker symbol "DO." In 1996, Diamond Offshore acquired Arethusa (Offshore) Ltd. in a stock transaction, reducing Loews' ownership in the company to 54%. In December 1996, Diamond Offshore sold its onshore business to DI Industries, Inc. Throughout the 2000s and 2010s, Diamond Offshore adjusted its fleet size by buying and selling rigs. Today, the fleet stands at 15 rigs, consisting of 11 semisubmersibles and four drillships.

### H.   Debtors' Corporate Organization

35. Diamond Offshore and 14 of its direct and indirect subsidiaries are Debtors in these Chapter 11 Cases:[8]

      (a)    Diamond Offshore Finance Company ("D.O. Finance"), a Delaware corporation, is a wholly-owned direct subsidiary of Diamond Offshore. D.O. Finance is the U.S. cash management company and a guarantor of certain drilling contracts.

      (b)    D.O. Finance owns five wholly-owned subsidiaries, of which the following four are Debtors:

            (i)    Diamond Offshore Development Company, which owns Diamond Offshore's office space in Houston, Texas;

---

[8]    The Company's complete corporate organization chart is attached hereto as Exhibit B.

(ii) Diamond Offshore Services Company ("D.O. Services"), a Delaware corporation, owns seven floater rigs—Ocean GreatWhite, Ocean America, Ocean Apex, Ocean Endeavor, Ocean Monarch, Ocean Onyx, and Ocean Valiant—and is a guarantor under the Revolving Credit Facility. D.O. Services, in turn, has owns two Debtor subsidiaries:

(1) Diamond Rig Investments Ltd. ("D. Rig Investments"), a United Kingdom company, is a wholly-owned subsidiary of D.O. Services. D. Rig Investments is a guarantor under the Revolving Credit Facility;

(2) Arethusa Off-Shore Company, a Delaware corporation, is an indirect subsidiary of D.O. Services. It is currently inactive;

(iii) Diamond Offshore Management Company, a Delaware corporation, employs Company personnel assigned to the U.S.; and

(iv) Diamond Offshore Company ("D.O. Company"), a Delaware corporation that serves as the Company's operating company for drilling in the Gulf of Mexico. As such, it is a party to four current drilling contracts.

(1) D.O. Company, in turn, has a wholly-owned subsidiary, Diamond Offshore General Co., a Delaware corporation that is Diamond Offshore's operating company for drilling in Australia and Southeast Asia. As such, Diamond Offshore General Co. is a party to five current drilling contracts.

(c) Diamond Foreign Asset Company ("DFAC"), a Cayman company, is a wholly-owned subsidiary of D.O. Services. DFAC is a borrower under the Revolving Credit Facility. In turn, DFAC has a number of direct and indirect subsidiaries, of which five are Debtors:

(i) Diamond Offshore International Ltd., a Cayman company, is a wholly-owned subsidiary of DFAC that is a guarantor under the Revolving Credit Facility and is the international cash management company;

(ii) Diamond Offshore Ltd., a United Kingdom company, is an indirect subsidiary of DFAC that owns five floater rigs—*Ocean BlackHawk*, *Ocean BlackHornet*, *Ocean BlackLion*, *Ocean BlackRhino*, and

*Ocean Valor*—and is a guarantor under the Revolving Credit Facility;

(iii)    Diamond Offshore Drilling (UK) Ltd., a United Kingdom company, is an indirect subsidiary of DFAC that owns two floater rigs—the *Ocean Patriot* and *Ocean Courage*—and is a party to five drilling contracts;

(iv)    Diamond Offshore (Brazil) LLC, a Delaware limited liability company, is an indirect subsidiary of DFAC that owns twenty-five and one-quarter percent (25.25%) of Brasdril Sociedade de Perfurações LTDA. ("Brasdril"), a Brazilian company, an operating company related to drilling operations in Brazil. Brasdril is a party to two drilling contracts; and

(v)    Diamond Offshore Holding LLC, a Delaware limited liability company, is an indirect subsidiary of DFAC. It owns the remaining seventy-four and three-quarter percent (74.75%) of Brasdril.

## I.    <u>Management Compensation</u>

36.    The Debtors' historical incentive compensation programs consisted of (a) an annual incentive program (the "<u>AIP</u>") and (b) a long-term incentive plan (the "<u>LTIP</u>") available to members of management and certain key employees. Prior to 2020, the AIP and LTIP included cash and long-term equity opportunities designed to attract, retain, and motivate talented employees to achieve financial and operational results.

37.    In January 2020, the Compensation Committee of the Company's board of directors engaged Frederic W. Cook & Co., Inc. ("<u>FW Cook</u>") to provide advice regarding the Company's compensation programs. Pursuant to this compensation review process, and after considering FW Cook's advice and recommendations, the Compensation Committee determined that equity-based awards would not be used to compensate the Debtors' executive officers in 2020. As discussed above, the general industry downturn has worsened precipitously since the beginning of the year due to the oil "price war" between OPEC and Russia and the COVID-19 pandemic. These developments caused a sharp decline in the value of Diamond Offshore's common stock and, in

turn, any equity-based awards issued by the Company.  At current share prices, the participating employees' existing equity awards are now largely worthless and new equity awards would provide little to no value to employees.  In addition, the prolonged industry contraction and unprecedented economic impact of the global pandemic have resulted in an inability to utilize traditional financial and operational performance metrics to measure the Debtors' performance achievements in the near- to medium-term.

38.     In March 2020, the Compensation Committee, relying upon extensive market analysis and the advice of the Company's restructuring advisors and compensation consultant, determined it would be in the best interests of the Company to forgo the plan to issue the 2020 LTIP awards and instead adopt a new cash-based incentive plan in order to appropriately reflect current economic and operating realities.  The new incentive plan is entirely performance-based for executives and is 50% performance-based for other participants.

39.     On April 21, 2020, the Board approved (a) a key employee incentive program (the "KEIP"), (b) a non-executive incentive program (the "NEIP"), and (c) a key employee retention program (the "KERP") to collectively replace the AIP and LTIP for 2020.  The KEIP, NEIP, and KERP are designed to provide the Debtors' key employees compensation opportunities commensurate with the opportunities available under the prior AIP and LTIP.  As part of that process, the Board of Directors also approved an amendment to LTIP awards from prior years, which provided for the immediate vesting and payment of a prorated portion of each participant's 2018 and 2019 cash LTIP awards earned as of April 1, 2020 based on actual Company performance achieved through that date.  The aggregate amount of such payments was approximately $3.55 million, and the payments are subject to a one-year clawback obligation in the event a participant resigns or is terminated for cause.

40.     Importantly,  the KEIP, NEIP, and KERP were designed to provide  the Debtors' key employees the same quantum of award opportunities  as was available  under the Debtors' previously  approved 2020 compensation programs.  Accordingly,  as a condition  to participating in the KEIP, NEIP, and KERP, eligible  employees must forego (a) all outstanding  rights under the prior  LTIP (after giving  effect to the payout  described  above), including  cash and equity components,  and (b) any awards under the 2020 AIP.  Notably, equity  awards under the prior LTIP were not converted in  connection  with the payout  described  above, and  will  be waived  and cancelled.

41.     The Debtors believe  that the KEIP, NEIP, and KERP are appropriately  tailored to incentivize  key employees and align key employees'  interests with the interests of the Debtors' creditors and other key stakeholders.  The Debtors intend to file a motion  to approve the KEIP, NEIP, and KERP shortly  after the Petition  Date to ensure  management  and the Debtors'  key employees remain appropriately  incentivized  to maximize  value for the Debtors' stakeholders in this exceptionally  challenging  business environment.

## III.     The Company's Capital Structure

42.     As of the Petition  Date, the Debtors' principal  non-contingent  liabilities  consist of outstanding  funded debt under the Revolving  Credit Facility  and four series  of unsecured notes with  an aggregate outstanding  principal  amount of approximately  $2.4 billion  (the "Prepetition Debt").

### A.     Revolving Credit Facility

43.     On October 2, 2018, the Company entered into a senior  5-year revolving  credit agreement  with  a syndicate  of  lenders  and Wells  Fargo  Bank,  National  Association, (the "Prepetition  RCF Agent")  as administrative  agent (the "Revolving  Credit Facility").  The

maximum amount of borrowings available under the Revolving Credit Facility is $950 million, which may be used for general corporate purposes, including investments, acquisitions, and capital expenditures. The Revolving Credit Facility matures on October 2, 2023 and provides for a swingline subfacility of $100.0 million and a letter of credit subfacility of $250.0 million. Any obligations arising under the facility are guaranteed by certain Debtors.[9] D.O. Services Co. has pledged 65% of its equity interest in DFAC as collateral in support of obligations owing under the Revolving Credit Facility. The Revolving Credit Facility is not otherwise secured by liens on the Debtors' assets, including any cash collateral. No other security interests have been granted to the RCF Lenders and all of the Borrowers and Guarantors under the Revolving Credit Facility are Debtors in these Chapter 11 Cases.

44.     The Revolving Credit Facility includes restrictions on borrowing if, after giving effect to any such borrowings and the application of the proceeds thereof, the aggregate amount of available cash would exceed $500 million. The Revolving Credit Facility contains a cross-default provision, among other covenants, with respect to the Company's and its subsidiaries' other indebtedness in excess of $100.0 million.

45.     As noted in <u>Section I</u> above, in March 2020, the Company borrowed a total of approximately $436 million under its Revolving Credit Facility as a precautionary measure to increase its cash position and preserve financial flexibility in light of the uncertain market conditions. As of the Petition Date, Diamond Offshore has approximately $442 million of borrowings and L/Cs outstanding under the Revolving Credit Facility.

---

[9]     The U.S. guarantors include D.O. Services Co. (Del.) and Diamond Rig Investments Limited (UK). The Foreign guarantors include Diamond Offshore Drilling, Inc., (Del.), D.O. Services Co. (Del.), Diamond Rig Investments Limited (UK), Diamond Offshore International Limited (Cayman), and Diamond Offshore Limited (UK).

**B.    Unsecured Senior Notes**

46.    As of the Petition Date, Diamond Offshore has four series of unsecured senior notes issued and outstanding.   All of the notes are senior, unsecured obligations of Diamond Offshore, and none of the notes are guaranteed by any of Diamond Offshore's subsidiaries.

(i)    5.7% Senior Notes due 2039.

47.    Diamond Offshore issued $500 million principal amount of 5.7% Senior Notes due 2039 (the "2039 Notes") under that certain Indenture, dated February 4, 1997 (the "Base Indenture"), by and among Diamond Offshore, as issuer, and the Chase Manhattan Bank, as Trustee, and that certain Seventh Supplemental Indenture, dated October 8, 2009, by and among Diamond Offshore, as issuer, and The Bank of New York Mellon, as trustee.  The 2039 Notes require semiannual coupon payments at an interest rate of 5.7% per annum, are not guaranteed, and are unsecured.

(ii)    3.45% Senior Notes due 2023

48.    Diamond Offshore issued $250 million principal amount of 3.45% Senior Notes due 2023 (the "2023 Notes") under the Base Indenture and that certain Eighth Supplemental Indenture, dated November 5, 2013 (the "Eighth Supplemental Indenture"), by and among Diamond Offshore, as issuer, and The Bank of New York Mellon, as trustee.  The 2023 Notes require semiannual coupon payments at an interest rate of 3.45% per annum, are not guaranteed, and are unsecured.

(iii)    4.875% Senior Notes due 2043

49.    Diamond Offshore issued $750 million principal amount of 4.875% Senior Notes due 2043 (the "2043 Notes") under the Base Indenture and the Eighth Supplemental Indenture.

The 2043 Notes require semiannual coupon payments at an interest rate of 4.875% per annum, are not guaranteed, and are unsecured.

(iv)    <u>7.875% Senior Notes due 2025</u>

50.    Diamond Offshore issued $500 million principal amount of 7.875% Senior Notes due 2025 (the "<u>2025 Notes</u>" and, together with the 2043 Notes, the 2023 Notes, and the 2039 Notes, the "<u>Senior Notes</u>") under the Base Indenture and that certain Ninth Supplemental Indenture, dated August 15, 2017, by and among Diamond Offshore, as issuer, and The Bank of New York Mellon Trust Company, N.A. as trustee. The 2025 Notes require semiannual coupon payments at an interest rate of 7.875% per annum, are not guaranteed, and are unsecured.

51.    As of the Petition Date, the aggregate principal amount of Senior Notes outstanding is $2 billion, together with any accrued and unpaid interest.

### C.    Common Stock

52.    As of the Petition Date, Diamond Offshore has approximately 144,781,766 shares of common stock issued and 137,703,910 shares of common stock outstanding, par value $0.01 per share. Diamond Offshore's common stock is listed on the NYSE under the symbol "DO." As of February 7, 2020, Loews owned approximately 53% of Diamond Offshore's issued and outstanding shares.

### D.    Cash

53.    As of the Petition Date, the Debtors had approximately $434.9 million of unrestricted cash on their balance sheet.

## IV.    Events Leading to the Commencement of These Chapter 11 Cases

54.    As explained above, the offshore drilling industry has experienced a prolonged period of declining dayrates and demand for contract drilling services. This general industry

22

downturn has worsened precipitously in recent months due to two unprecedented global events: an oil "price war" between OPEC and Russia and the COVID-19 pandemic. These developments adversely impacted both the Company and its customers.

55.     Starting in December 2019, the Debtors considered a variety of liability management and liquidity preservation initiatives, including possible out-of-court exchange transactions. At that time, the Debtors retained the services of Lazard Frères & Co. LLC ("Lazard") as financial advisor and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") as legal advisor to assist Company management and the Board (defined below) in analyzing and evaluating various alternatives with respect to the Company's capital structure. In addition to taking proactive cost-cutting measures and efficiency improvements, the Company explored several potential transactions that would have extended maturities and potentially captured a trading discount in its Senior Notes through exchange transactions. As the COVID-19 pandemic rapidly escalated, and the oil markets reeled from the OPEC dispute with Russia, the Company pivoted its focus to preserving its existing contract backlog and liquidity position.

56.     On March 16, 2020, the Company delivered a notice of termination (the "Notice") under the 5-Year Revolving Credit Agreement, dated as of September 28, 2012, as amended (the "2012 Credit Facility"), among Diamond Offshore, Diamond Foreign Asset Company ("DFAC"), the lenders party thereto and Wilmington Trust, National Association, as administrative agent. The 2012 Credit Facility provided for an aggregate principal amount of commitments of $325.0 million, of which $100.0 million matured in 2019, with the remaining $225.0 million of commitments scheduled to mature on October 22, 2020. Pursuant to the Notice, the 2012 Credit Facility was terminated effective March 17, 2020 (the "Termination"). As of the

time of the Notice, there were no borrowings outstanding under the 2012 Credit Facility. The Company did not incur any early termination penalties in connection with the Termination.

57.     The Company delivered the Termination in connection with certain transactions undertaken to preserve its financial flexibility. As noted above, certain of the Debtors are party to the Revolving Credit Facility with a maximum borrowing availability of $950.0 million. On March 17, 2020, the Company provided notice to the lenders to borrow an aggregate of $400.0 million under the Revolving Credit Facility (the "Drawdown"). Following the March 17 draw, the Company borrowed an additional $36 million under the Revolving Credit Facility. The Company increased its borrowings under the Revolving Credit Facility as a precautionary measure in order to increase their cash position and preserve financial flexibility in light of current uncertainty in the global markets resulting from the COVID-19 outbreak. In accordance with the terms of the Revolving Credit Facility, the proceeds from borrowings under the Revolving Credit Facility may in the future be used for general corporate purposes, including investments, capital expenditures and other purposes permitted by the Revolving Credit Facility.

58.     On March 20, 2020, the Board formed a Finance Committee to review, consider, evaluate, and make recommendations to the Board regarding one or more strategic transactions. [10] Since its inception, the Finance Committee has worked closely with management and the Company's advisors, including Paul, Weiss, Lazard and Alvarez & Marsal North America, LLC ("A&M") (collectively, the "Advisors") to determine the optimal path forward for the Company.

59.     In addition to adverse market conditions, the Company faced approximately $36 million of interest payments due under the Senior Notes on or before May 1, 2020.

---

[10]     Marc Edwards, Kenneth Siegel, and Alan Howard serve on the Finance Committee.

Specifically, $14 million was due on April 15, 2020 under the 2039 Notes, and $4 million and $18 million would become due on May 1, 2020 under the 2023 Note and 2043 Notes respectively.

60.     On April 15, 2020, the Company elected not to make the semiannual interest payment due in respect of the 2039 Notes.  Under the terms of the indenture governing the Notes, the interest payment was due on April 15, 2020, and Diamond Offshore has a 30-day grace period to make the payment.  Non-payment of the interest on the due date was not an event of default under the indenture governing the Notes but would have become an event of default if the payment was not made within the 30-day grace period or these Chapter 11 Cases were not commenced.  An event of default under the indenture governing the Notes would have resulted in a cross default under the Revolving Credit Facility, whereupon the Notes and the Company's borrowings under the Revolving Credit Facility Agreement would have been subject to acceleration. The acceleration of the Notes or the Company's borrowings under the Revolving Credit Facility would have resulted in a cross-default under the indentures governing the 2023 Notes, the 2025 Notes, and the 2043 Notes, whereupon such notes would then be subject to acceleration, subject to a 10-day cure period.  During the grace period, the Company is not permitted to borrow additional amounts under the Revolving Credit Facility

61.     Prior to and during the grace period, the Company actively engaged with its customers to preserve the Debtors' contract backlog.  The Company's customers are also facing challenges as a result of current market conditions and almost all have requested some form of concessions from the Company under their existing contracts, which, subject to ongoing discussions with Beach Energy, the Debtors have so far successfully navigated. As of the Petition Date, management effectively managed customer demands to preserve the Company's backlog and customer relationships by, among other things:

(a)     Entering into an amendment of the Company's contracts with one customer to transfer backlog between rigs and leverage more favorable dayrates;

(b)     Negotiating standby arrangements to cover the Company's costs while rigs are subject to travel restrictions and other COVID-19 related limitations; and

(c)     Managing through multiple operational and logistical challenges to ensure the continued operation of the Company's rigs, including social distancing, sequestering, and other policies implemented in response to COVID-19.

62.     Despite the Company's successful negotiations with the majority of their customer counterparties, on April 20, 2020, the Company received a purported notice of termination from Beach Energy (Operations) Limited ("Beach") of its drilling contract for the *Ocean Onyx*. The drilling contract was entered into on December 19, 2018, and the *Ocean Onyx* had recently completed shipyard modifications requested by Beach and relocated for commencement of the Victorian Otway Basin offshore drilling campaign for Beach.

63.     Although the Company does not believe that Beach had a valid or lawful right to terminate the contract or that the purported notice of termination is effective, it remains in discussions with Beach to resolve this dispute consensually and commercially. In addition, the Debtor party to the Beach contract has filed, contemporaneously with the chapter 11 filing, an adversary complaint against Beach seeking a determination that Beach's purported termination is invalid and that the drilling contract remains in effect.

64.     Given the need to preserve liquidity and protect contract backlog, management and the Advisors began analyzing the potential benefits of filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. In addition, the Company, in consultation with Paul, Weiss, also considered whether Diamond Offshore and any of its subsidiaries are eligible for relief under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and whether that eligibility counseled in favor of delaying the filing of the Chapter 11 Cases to pursue such

relief.  Among other programs, the Company considered its eligibility for a loan under the Paycheck Protection Program ("PPP") of the Keeping American Workers Paid and Employed Act or under section 4003(b) of the Coronavirus Economic Stabilization Act of 2020.  The Company concluded that its size renders it ineligible for a PPP loan, and it remains unclear whether the Company is eligible for a section 4003(b) loan.  Moreover, even if the Company was eligible, loan proceeds likely would not be available until June 2020, and would not enable the Company to improve its balance sheet.

65.     After careful consideration, the Company concluded that waiting for potential benefits the receipt of which are uncertain at best, while continuing to pay existing debt service and risking the Company's contract backlog, was not in the best interests of the Company or its stakeholders.

66.     Shortly before the Petition Date, the Company commenced preliminary discussions with the Prepetition RCF Agent, represented by Bracewell LLP and FTI Consulting, and with an *ad hoc* group of holders of the Senior Notes (the "Ad Hoc Group" and the holders, the "Ad Hoc Group of Senior Noteholders") represented by Milbank LLP ("Milbank") and Evercore Inc. (together with Milbank, the "Ad Hoc Group Advisors").  On April 20, 2020, the Company entered into non-disclosure agreements with the Ad Hoc Group Advisors and began sharing certain financial and other information regarding the Company's business and the commencement of these Chapter 11 Cases with the Prepetition RCF Agent and the Ad Hoc Group.  The Ad Hoc Group Advisors and the Prepetition RCF Agent have reviewed and commented on substantially all of the First Day Motions prior to Petition Date.  The Company expects to work constructively with the Ad Hoc Group and Prepetition RCF Agent during these Chapter 11 Cases.

67.     The Debtors determined to commence these Chapter 11 Cases to preserve their valuable contract backlog, and preserve their approximately $434.9 million in unrestricted cash on hand while avoiding annual interest expense of approximately $140.1 million under the Revolving Credit Facility and the Senior Notes, and to stabilize operations while proactively restructuring their balance sheet to successfully compete in the changing global energy markets.  The Debtors and their Advisors believe cash on hand provides adequate funding at the outset of these cases. The Debtors are well-positioned to successfully emerge from bankruptcy with a highly marketable fleet, a solid backlog of activity, a strong balance sheet and liquidity position, and a differentiated approach and set of capabilities.  Despite the volatile and current uncertain market conditions, the Debtors remain confident in the need for their industry, its importance around the world, and the critical services they provide.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

April 26, 2020                                              */s/ Marc Edwards*
                                                            Marc Edwards
                                                            President and Chief Executive Officer
                                                            Diamond Offshore Drilling, Inc.